Steven M. **KRAMER**, Appellee,

v.

Richard **THOMPSON**, Appellant.

Nos. 90–1488, 90–1640.

United States Court of Appeals,
Third Circuit.

Argued Nov. 30, 1990.

Decided Oct. 15, 1991.

Rehearing and Rehearing In Banc
Denied Nov. 14, 1991.

Steven M. Kramer (argued), Steven M. Kramer & Associates, New York City, for appellee.

Cletus P. Lyman (argued), Richard A. Ash, Michael S. Fettner, Lyman & Ash, Philadelphia, Pa., for appellant.

Before BECKER, NYGAARD and ALITO, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

These appeals, from various injunctive orders and a damages judgment of the district court for the Eastern District of Pennsylvania in a bizarre libel case founded upon our diversity jurisdiction, present the interesting question under Pennsylvania law of the ability of a judge to enjoin future libels and to compel the retraction of past libels. For the reasons that follow, we will reverse the district court's orders enjoining defendant/appellant Richard Thompson from publishing further libels against plaintiff/appellee Steven M. Kramer, his former lawyer, and ordering Thompson to retract past libelous statements. The judgment awarding damages will be reversed and remanded for a new trial on damages for the reasons set forth in a companion opinion filed this day.

## I. FACTS AND PROCEDURAL HISTORY

The parties' relationship began in July 1982, when Thompson retained Kramer to bring a securities fraud claim against Thompson's former broker, Prudential–Bache, Inc. No question was raised by Thompson concerning Kramer's stewardship for the next three years. Indeed, during this time, Thompson wrote on several occasions praising Kramer's performance.[1] Then, in the fall of 1985, Kramer was contacted by an F.B.I. agent to whom Thompson previously had complained about his investment losses at Prudential–Bache.

---

1. Thompson is a self-employed exporter of pumps and other equipment and a self-styled consumer activist, who writes frequently under the letterhead of the "Thompson–American Antifraud League."

The agent asked Kramer whether the stocks at issue were completely worthless. Kramer responded that Thompson had purchased the stocks for roughly $120,000 and later had sold them for approximately $15,000. Thus, while informing the agent that Thompson had suffered a very substantial loss, Kramer also informed the agent that technically the stocks were not worthless. When Thompson learned of this conversation, however, he became enraged, and accused Kramer of deliberately dissuading the F.B.I. from investigating the matter. The parties' relationship deteriorated rapidly thereafter and, in October 1985, Thompson discharged Kramer as his counsel.

Seeking to ensure that he ultimately would be compensated for his services, Kramer refused to return the case files to Thompson until the latter agreed to deposit the proceeds of any future judgment or settlement with the court pending resolution of the attorney's fees issue. Thompson would not agree, and Kramer secured an order from the district court which provided that any funds recovered would be placed in escrow, and that the fee dispute would be arbitrated. Kramer then made the case files available to Thompson and his new counsel.

On February 4, 1986, Thompson wrote to the Disciplinary Board of the Pennsylvania Supreme Court (the "Disciplinary Board") alleging that Kramer had failed to represent him effectively in the Prudential–Bache action.[2] At about the same time, Thompson began writing a series of critical and accusatory letters about Kramer to various private attorneys, federal judges, F.B.I. agents, federal and state prosecutors, newspapers, and television stations in the Philadelphia area.[3] With varying degrees of repetition, these letters alleged that Kramer: (1) had "thrown" Thompson's case; (2) had deliberately destroyed certain documents related to the case; (3) had used

drugs and was a member of the highly publicized "Yuppie Drug Ring" organized by Philadelphia dentist Lawrence Lavin;[4] (4) was connected to organized crime; and (5) had committed arson on his own car. Kramer demanded a retraction, but Thompson refused.

Kramer thereupon brought a libel action against Thompson in the Court of Common Pleas of Philadelphia County. Undaunted by Kramer's suit, Thompson continued his letter-writing campaign. The court eventually entered a default judgment on the issue of liability against Thompson for failure to comply with discovery.

After the default judgment was entered against him, Thompson ceased to write critically about Kramer for approximately two years. In early 1989, however, Thompson became aware of a suit filed by Kramer in federal district court against Mano Arco, a garage that had performed repair work on Kramer's car. Kramer's suit alleged that Mano Arco's negligent workmanship had been responsible for the fire that engulfed his car while it was travelling on the New Jersey Turnpike. Thompson took it upon himself to contact, first by phone and then by letter, the lawyer for Mano Arco. After informing the lawyer of his view that Kramer had committed arson on his own car, Thompson resumed his accusations that Kramer had thrown Thompson's securities fraud case, and that he was involved in the Yuppie Drug Ring and the underworld. Thompson's letter to Mano Arco's attorney purported to be copied to the state Disciplinary Board, the federal judge hearing the case, The *Philadelphia Inquirer*, the United States Justice Department, and Kramer.

Kramer then filed the instant libel action in the United States District Court for the Eastern District of Pennsylvania, alleging diversity of citizenship.[5] Thompson filed

---

**2.** On April 8, 1986, the Disciplinary Board dismissed Thompson's complaint.

**3.** Thompson sent a total of at least 160 separate letters to 60 different individuals or entities.

**4.** Thompson's apparent basis for this accusation was Kramer's representation of several minority

shareholders of WMOT Enterprises, Inc., a company which had been infiltrated and bilked of funds by one of Lavin's co-conspirators.

**5.** Thompson is a citizen of Pennsylvania. Kramer averred in his complaint that he is a citizen of New York, although he has law offices in Philadelphia. On September 12, 1990, while

an answer, naming thirteen third-party defendants and asserting counterclaims for libel and slander, legal malpractice, obstruction of justice, malicious prosecution, and civil RICO violations. The district court later dismissed the third-party defendants and the counterclaims, and imposed sanctions on Thompson with respect to one of the third-party defendants.

Trial commenced on April 2, 1990.[6] Having determined that Thompson's statements were *per se* libelous in that they were false and made in reckless disregard of their truth or falsity, the court directed a verdict for Kramer at the close of Kramer's case—i.e., without hearing Thompson's defense on the issue of liability. The court restricted the scope of Thompson's case to evidence relevant to the calculation of compensatory and punitive damages. Heeding the court's suggestion that his only hope for mitigating damages was to demonstrate contrition, Thompson took the witness stand, delivered a grudging and rambling apology, and promised not to publish future defamatory statements. Kramer cross-examined Thompson, challenging the sincerity of his apology, and Thompson rested.

After closing arguments, the court instructed the jury to award damages based only on those libelous statements issued between the filing of the state court action in February of 1986 and the filing of the federal court action in April of 1989, and to render its verdict in the form of special interrogatories on compensatory and punitive damages. During its deliberations, the jury inquired whether it also could require Thompson to send a letter of retraction to all persons who had received the libelous communications. The court responded that it was inappropriate for the jury to do so, but assured the jury that the court would require Thompson to issue a retraction, in addition to whatever damages were awarded.

The jury ultimately awarded Kramer $100,000 in compensatory and $38,000 in punitive damages, and the district court entered judgment accordingly on April 10, 1990. The court simultaneously entered a permanent injunction, prohibiting Thompson from making further statements about Kramer of the type adjudged libelous, and ordering him to write letters of retraction to all persons who had received prior libelous communications.[7] Thompson's post-trial motions for judgment n.o.v. and for a new trial were denied. Thompson filed a timely notice of appeal (No. 90–1488).

After learning that Thompson had failed to send all the retraction letters required by the court's permanent injunction, Kramer moved to hold Thompson in contempt of court. Although declining to hold Thompson in civil contempt, the district court, *inter alia*, again ordered him to make the appropriate retractions.[8]

Shortly thereafter, Thompson submitted a petition, which he later amended, seeking leave to appear as *amicus curiae* in the

awaiting oral argument before this court, Thompson filed papers alleging that Kramer is actually a citizen of Pennsylvania and suggesting that diversity jurisdiction may be lacking. On June 10, 1991, we remanded to the district court for fact-finding regarding Kramer's citizenship for diversity jurisdiction purposes, but retained jurisdiction meanwhile. The district court, after a hearing, found that Kramer is a citizen of New York and therefore that diversity jurisdiction does exist. This finding is certainly not clearly erroneous.

6. On the first day of trial, the district court granted Kramer's request for a restraining order that prohibited Thompson from transferring or encumbering his home, and from drawing on his corporate bank account, pending conclusion of the litigation.

7. The court also ordered that the restraining order regarding transfer or encumbrance of assets, entered April 2, 1990, be made permanent pending satisfaction of the judgment and be expanded to cover all banking institutions in which Thompson had funds.

8. Presented with evidence that Thompson had closed two bank accounts in violation of the court's restraining order, the district court also entered a new restraining order, which specifically prohibited Thompson from withdrawing the funds that he had withdrawn and redeposited at another bank. The court also awarded Kramer $2,550 in fees and costs associated with the contempt proceeding.

case of *Matthews v. Freedman,* Appeal No. 89–2112, then pending before this court. *Matthews* involved an appeal by Kramer of sanctions imposed on him by a district court in a matter unrelated to his litigation with Thompson. Thompson's petition contained renewed accusations that Kramer had "thrown" his case, was associated with the Yuppie Drug Ring, and generally was guilty of perjury, forgery, fraud, and extortion. In the petition, Thompson also repudiated the prior retraction letter that the district court had "forced" him to write. Thompson sent copies of his petition to the Disciplinary Board, U.S. Attorney's Office, F.B.I., I.R.S., and lawyers associated with the *Matthews* case.

Kramer filed a second motion to hold Thompson in contempt. This time, the district court declared Thompson in civil contempt of the permanent injunction, and ordered that he be confined and fined $500 per day until he purged himself of contempt by withdrawing all statements and court filings related to the *Matthews* case. Thompson then drafted, and the court edited and approved, the required letter of withdrawal. The court also ordered Thompson to advise the Clerk of this court, in regard to the instant appeal, that he had "admitted under oath in the trial of this matter that he defamed Steven Kramer and promised the jury, before verdict, that he apologized and would not in the future make such statements as were accused as defamatory by plaintiff."

On August 24, 1990, the district court entered an expanded injunction prohibiting Thompson from contacting any person with whom Kramer conducts his business. Thompson filed a second notice of appeal with this court (No. 90–1640), which was consolidated with Thompson's pending appeal. We granted expedited argument, but refused Thompson's motion to stay enforcement of the injunction pending disposition of his appeal.[9] After hearing argument, however, we stayed enforcement of the injunction, pending that disposition.[10]

## II. DISCUSSION

Thompson appeals from a variety of orders of the district court, raising numerous allegations of error. We consider most of these in our companion memorandum opinion filed this day.[11] We will limit our inquiry in this opinion to the challenges to the permanent injunction entered by the district court against Thompson after trial and to that injunction's subsequent enforcement and expansion.

As discussed above, this injunction essentially provided Kramer with two forms of equitable relief, in addition to the $138,000 in damages awarded by the jury. First, the court, threatening civil contempt, enjoined Thompson initially from issuing new statements of the type found libelous, and ultimately from contacting anyone with whom Kramer does business. Second, the injunction required Thompson to retract or withdraw various previously issued libelous statements and court filings. Thompson argues that the permanent injunction thus had the effect of "prohibiting and mandating" speech in violation of the First Amendment to the United States Constitution and Article I, section 7 of the Pennsylvania Constitution. We will consider separately Thompson's challenges to the prohibitory injunction and to the retraction order.

### A. *Injunction Against Further Defamatory Statements*

■ It is axiomatic in this diversity case that the injunction cannot stand if it contra-

9. Thompson may have continued to violate the permanent injunction even after the district court expanded it on August 24, 1990. On October 31, 1990, Kramer filed a third contempt motion with the district court, containing detailed allegations of further publications of the same libel, which the court agreed to hear on an expedited basis, scheduling a hearing for November 16. Thompson moved the district court to stay the hearing pending resolution of his appeal by this court. The district court initially refused, but ultimately acquiesced.

10. On June 14, 1991, after our remand to the district court on the diversity jurisdiction issue, *see supra* note 5, we stayed pending resolution of this appeal all execution proceedings and discovery in aid of execution relating to the $138,000 judgment against Thompson.

11. *See Kramer v. Thompson,* No. 90–1488, (3d Cir. Oct. 15, 1991).

venes *either* the United States or Pennsylvania Constitutions. Because Thompson presses his claim principally by reference to the Pennsylvania Constitution, we will begin our analysis there. In light of our conclusion that the Pennsylvania Constitution does prohibit a judge from enjoining future libelous speech, we do not need to consider its federal analog.

Thompson relies primarily upon *Willing v. Mazzocone*, 482 Pa. 377, 393 A.2d 1155 (1978), which he argues is on all fours with the instant dispute, and which stands for the proposition that the Pennsylvania Constitution does not tolerate an injunction against libelous speech. Although we ultimately conclude that *Willing* differs in important respects from the instant dispute, the factual and legal contours of the two cases are sufficiently similar to merit a detailed comparison.

In 1968, defendant Helen Willing retained plaintiffs Carl Mazzocone and Charles Quinn, who practiced law together, to represent her in a worker's compensation claim. The two lawyers successfully obtained a settlement for Willing, from which she collected disability benefits for several years. In addition to their fee, Mazzocone and Quinn deducted $150 from the settlement as costs of the case. They claimed, and their records verified, that the money had been paid to one Dr. Robert DeSilverio, a psychiatrist who had been retained to testify on Willing's behalf.

At some point, for an unknown reason (and contrary to all available evidence), Willing came to believe that Mazzocone and Quinn had diverted for their own benefit $25 of the $150 allegedly paid to Dr. DeSilverio. For two days in 1975, Willing marched in protest in an area adjacent to the court buildings at City Hall in Philadelphia where the Court of Common Pleas, before which Mazzocone and Quinn practiced, was located. While marching, Willing wore a "sandwich-board" sign around her neck and on which she had written:

LAW–FIRM

of

QUINN–MAZZOCONE

*Stole money from me*—and

Sold-me-out-to-the

INSURANCE COMPANY

To attract attention while marching, Willing pushed a shopping cart bearing an American flag, continuously rang a cow bell, and blew on a whistle.

Mazzocone and Quinn attempted unsuccessfully to discourage Willing from further public protest. The two then filed a complaint in equity in the Court of Common Pleas of Philadelphia County seeking an injunction against further demonstration. The court found that there was no factual basis for Willing's defamatory protest, but noted that "either by reason of eccentricity or an even more serious mental instability," Willing could not be convinced that she had not been defrauded. 393 A.2d at 1157. The court enjoined Willing from further demonstration or picketing and from "carrying placards which contain defamatory and libelous statements and or uttering, publishing and declaring defamatory statements against [Mazzocone and Quinn]." *Id.*

On appeal, the Superior Court of Pennsylvania affirmed the injunction, although narrowing it somewhat so as to prohibit Willing only from "uttering or publishing statements to the effect that Mazzocone and Quinn, Attorneys-at-Law stole money from her and sold her out to the insurance company." *Mazzocone v. Willing*, 246 Pa.Super. 98, 369 A.2d 829, 834 (1976). In affirming the injunction, the Superior Court openly rejected the "traditional view that equity does not have the power to enjoin the publication of defamatory matter." *Id.*, 369 A.2d at 831 (citations omitted).[12] The court noted that four reasons

---

**12.** The origin of this common-law precept is generally traced to Lord Eldon's *dicta* in *Gee v. Pritchard,* 2 Swans. 402, 36 Eng.Rep. 670 (1818), as adopted in the United States in *Brandreth v.* *Lance,* 8 Paige 24 (N.Y.Ch.1839). These decisions reflected a distrust of equitable jurisdiction over libel, traceable, in part, to the Star Chamber which "once exercised the power of

traditionally have been offered to justify equity's refusal to enjoin defamation:

> (1) equity will afford protection only to property rights; (2) an injunction would deprive the defendant of his right to a jury trial on the issue of the truth of the publication; (3) the plaintiff has an adequate remedy at law; and (4) an injunction would be unconstitutional as a prior restraint on freedom of expression.

*Id.* The court then went on to state that "the logic and soundness of these reasons have been severely criticized by numerous commentators," [13] and that "[o]ur own analysis compels us to conclude that blind application of the majority view to the instant case would be antithetical to equity's historic function of maintaining flexibility and accomplishing total justice whenever possible." *Id.* The court then reviewed each of the four traditional justifications.

First, the court noted that the Pennsylvania Supreme Court had expressly repudiated the maxim that equity will protect property rights but not personal rights. *Id.* (citing *Everett v. Harron*, 380 Pa. 123, 110 A.2d 383 (1955)).[14] Pennsylvania apparent-

---

cutting off the ears, branding the foreheads, and slitting the noses of the libellers of important personages ... and [which] was [also] ... in the habit of restraining the publication of such libels by injunction." *Brandreth*, 8 Paige at 26. *See generally Kwass v. Kersey*, 139 W.Va. 497, 81 S.E.2d 237, 242 (1954) (reviewing rationale for evolution of common-law rule). As an outgrowth of *Gee* and *Brandreth*, libel plaintiffs in the United States generally have been limited to legal relief in the form of money damages.

**13.** The first assault on the common law's refusal to enjoin a defamation was led by Dean Roscoe Pound, *see* Pound, *Equitable Relief Against Defamation and Injuries to Personality*, 29 Harv. L.Rev. 640 (1916), who apparently became so convinced of the wisdom and inevitability of abandoning the rule that he and Professor Chafee published a casebook detailing the emerging trend, *see* R. Pound and Z. Chafee, *Cases on Equitable Relief Against Defamation and Injuries to Personality* (1930). Pound's work has spawned a considerable body of literature over the years which has criticized the common-law rule, lamented the inadequacy of money damages as a remedy for defamation, and advocated a variety of alternative equitable remedies including declaratory judgment, right of reply, voluntary or mandatory retraction, injunction, and arbitration. *See generally* Long, *Equitable Jurisdiction to Protect Personal Rights*, 33 Yale L.J. 115 (1923); Chafee, *Possible New Remedies for Errors in the Press*, 60 Harv.L.Rev. 1 (1946); Donnelly, *The Right of Reply: An Alternative to an Action for Libel*, 34 Va.L.Rev. 867 (1948); Leflar, *Legal Remedies for Defamation*, 6 Ark. L.Rev. & B. Ass'n J. 423 (1952); Note, *Developments in the Law of Defamation*, 69 Harv.L.Rev. 875 (1956) [hereinafter Note, *Developments in Defamation* ]; Note, *Developments in the Law of Injunctions*, 78 Harv.L.Rev. 994 (1965) [hereinafter Note, *Developments in Injunctions* ]; Note, *Vindication of the Reputation of a Public Official*, 80 Harv.L.Rev. 1730 (1967); Bertelsman, *Injunctions Against Speech and Writing: A Re-Evaluation*, 59 Ky.L.J. 319 (1970); Note, *Corporate Defamation and Product Disparagement: Narrowing the Analogy to Personal Defamation*,

75 Colum.L.Rev. 963 (1975); Hulme, *Vindicating Reputation: An Alternative to Damages As a Remedy for Defamation*, 30 Am.U.L.Rev. 375 (1981); Gold, *Does Equity Still Lack Jurisdiction to Enjoin a Libel or Slander?*, 48 Brook.L.Rev. 231 (1982); Barron, *The Search for Media Accountability*, 19 Suffolk U.L.Rev. 789 (1985); Franklin, *A Declaratory Judgment Alternative to Current Libel Law*, 74 Cal.L.Rev. 809 (1986); Leval, *The No-Money, No-Fault Libel Suit: Keeping Sullivan in its Proper Place*, 101 Harv. L.Rev. 1287 (1988); Wissler, Bezanson, Cranberg & Soloski, *Why Current Libel Law Doesn't Work and What Judges Can Do About It*, 27 Judges' J. 29 (1988); and Dienes, *Libel Reform: An Appraisal*, 23 U.Mich.J.L.Ref. 1 (1989).

**14.** The differential protection provided in equity for property and personal rights was a particular source of annoyance for Dean Pound:

> If a threatened tort involves injury to property for which the legal remedy is inadequate ... preventive relief is normally available. But if an injury to personality is threatened, wholly destructive of plaintiff's dearest interest, we are told that his only recourse is the legal remedy of damages although no pecuniary measure can possibly be applied to the interest and no pecuniary standard to the wrong. May we give any reasons other than purely historical for a doctrine which at first blush is so arbitrary and unjust? Do the rules which our books still announce upon this subject rest upon any basis more legitimate than unintelligent adherence to the *dicta* of a great judge in the pioneer case? May we put this corner of the law in the order of reason by making the rules thereof conform to the general principle of concurrent jurisdiction where the legal remedy for a legal right is inadequate or by showing sound reason why, in this one spot, that general principle should not obtain?

Pound, *supra* note 13 at 640–41. *See also Murphy v. Daytona Beach Humane Society*, 176 So.2d 922, 926–27 (Fla.App.1965) (Wigginton, J., specially concurring) (expressing similar criticism).

ly is now in line with the Restatement and the vast majority of other jurisdictions in this regard. *See Kenyon v. City of Chicopee,* 320 Mass. 528, 70 N.E.2d 241, 244 (1946); *see generally* Restatement (Second) of Torts § 937 comment (a) (1969); Gold, *supra* note 13, at 236–37; Note, *Developments in Injunctions, supra* note 13, at 998–1000. *But see Murphy v. Daytona Beach Humane Society,* 176 So.2d 922, 924 (Fla.App.1965) (denying injunction against defamation based on traditional view that equity will not protect rights of personality).

Second, the Superior Court reasoned that the argument that a defendant has a right to a jury determination as to the truth of a publication [15] "loses all persuasion ... in those situations where the plaintiff has clearly established before a judicial tribunal that the matter sought to be enjoined is both defamatory and false." 369 A.2d at 831. Because there was no doubt that Willing's sign was both false and malicious,

the Superior Court reasoned that "[t]o refuse injunctive relief under the circumstances of this case on the grounds that defendant would be denied a jury trial is to elevate form over substance." *Id.* 369 A.2d at 832.

Third, the Superior Court challenged the precept that plaintiffs do not need equitable relief because they have an adequate remedy at law for damages.[16] In particular, the Superior Court reasoned that Mazzocone and Quinn did *not* have an adequate remedy at law because: (1) the value of their professional and personal reputations, and the diminution in that value resulting from Willing's libel, were difficult to prove and measure; (2) given Willing's apparent mental instability, it was reasonable to assume that she would continue to libel the plaintiffs, necessitating a multiplicity of damage actions on their behalf; and (3) Willing was indigent, rendering any action for damages a "pointless gesture" in any event.[17] 369 A.2d at 832.

---

**15.** The notion of the right to a jury determination as to the libelous nature of speech apparently originated with Fox's Libel Act, 32 Geo. II, c. 60, § 1 (1792), which stated:

> On every such trial the jury sworn to try the issue may give a general verdict of guilty or not guilty upon the whole matter put in issue ... and shall not be required or directed by the Court or judge ... to find the defendant ... guilty merely on the proof of publication by such defendant ... of the paper charged to be a libel....

Prior to Fox's Act, English judges had determined whether a particular statement was libelous; the jury merely determined whether there had been publication of the statement. *See* Leflar, *supra* note 13, at 434 n. 37. Fox's Act thus expanded the jury's role, a development which was transplanted to America when many of the states subsequently patterned their respective constitutional and statutory provisions governing libel upon the Act, *see* Note, *Developments in Defamation, supra* note 13, at 944. Since this time, numerous courts have referred to the right to a jury trial in denying injunctions against defamation, generally reasoning that the jury provides a safeguard against judicial censorship of speech. *See Schmoldt v. Oakley,* 390 P.2d 882, 886 (Okl.1964). *See generally* Annotation, *Injunction as Remedy Against Defamation of Person,* 47 A.L.R.2d 715, 727–28 [§ 5b] (1956) (citing cases).

**16.** This precept is also of considerable vintage: The adequate remedy rule well reflected Chancery's subordinate position as it devel-

oped in medieval England against the background of the established courts of law. Equity was a "gloss" on the law; its sole justification for assuming jurisdiction was that traditional legal remedies and procedures could not offer the plaintiff satisfactory relief.

Note, *Developments in Injunctions, supra* note 13, at 997 (citations omitted). Although law and equity have been merged in most jurisdictions, the adequate remedy rule continues to be cited frequently as a ground for denying injunctive relief against defamation. *See Alberti v. Cruise,* 383 F.2d 268 (4th Cir.1967); Annotation, *Injunction as Remedy Against Defamation of Person,* 47 A.L.R.2d 715, 724–25 [§ 4a] (1956) (and cases cited therein).

**17.** The adequate remedy at law rationale for denying injunctions against defamations has been rejected or criticized in numerous reported decisions and in the literature. *See generally Dino de Laurentiis Cinematografica, S.p.A. v. D-150, Inc.,* 366 F.2d 373, 375–76 (2d Cir.1966); *Menard v. Houle,* 298 Mass. 546, 11 N.E.2d 436, 437 (1937); *Murphy,* 176 So.2d at 927 (Wigginton, J. specially concurring); Note, *Developments in Injunctions, supra* note 13, at 1000–04; Bertelsman, *supra* note 13, at 320; Gold, *supra* note 13, at 262; These cases and articles generally adopt the modern view, reflected in the Restatement (Second) of Torts § 936 (1969), that the availability of legal remedies is merely one of the factors to be considered in determining the appropriateness of an injunction against a threatened tort.

In light of these factors, the Superior Court concluded that Mazzocone and Quinn did not have an adequate remedy at law.

Fourth, although the Superior Court acknowledged that the argument that an injunction against defamation is an unconstitutional prior restraint on free expression [18] "is by far the most cogent of all the reasons offered in support of the traditional view," [19] it reasoned that not all restrictions on speech constitute prior restraints. 369 A.2d at 832. Invoking Justice Frankfurter's opinion in *Kingsley Books, Inc. v. Brown,* 354 U.S. 436, 441–42, 77 S.Ct. 1325, 1327–28, 1 L.Ed.2d 1469 (1957), the court maintained instead that "a pragmatic and modern rather than a theoretical and historical approach" should be employed in determining what constitutes a prior restraint. 369 A.2d at 832–33. As explicated by the Superior Court, this pragmatic approach should attempt to weigh, on a case-by-case basis, the likelihood that the alleged defamatory statements were true, the magnitude of the harm done to the plaintiff if the speech is not restrained, the adequacy of legal remedies, and, most importantly, whether the public interest will be disserved by suppressing the speech. *Id.* 369 A.2d at 833–34 (citations omitted). Under this pragmatic approach, the court concluded, the injunction against Willing should not be considered an unconstitutional prior restraint.

In the case at bar, we perceive no public interest so substantial or significant as to permit defendant's continuing false accusations concerning plaintiff's professional conduct. On the other hand, the injury to plaintiff's reputation can be extensive and irreparable if the defendant is permitted to continue her activities. Under these circumstances, the court below properly granted the injunction.

*Id.,* 369 A.2d at 834.

The Supreme Court of Pennsylvania reversed, essentially refuting the reasoning of the Superior Court on two grounds. 482 Pa. 377, 393 A.2d 1155 (1978). First, invoking Blackstone and referencing the pernicious English Licensing Acts, *see supra* note 18, the Supreme Court noted that the Commonwealth of Pennsylvania long has rejected any prior restraint on the exercise of speech as reflected in Article I, section 7 of the Pennsylvania Constitution [20] and in

---

**18.** The abhorrence of prior or previous restraints on speech apparently was imported into American legal lore from Blackstone:

The liberty of the press is indeed essential to the nature of a free state; but this consists in laying no *previous restraints* upon publications, and not in freedom from censure for criminal matter when published. Every free man has an undoubted right to lay what sentiments he pleases before the public; to forbid this, is to destroy the freedom of the press; but if he publishes what is improper, mischievous or illegal, he must take the consequences of his own temerity.

W. Blackstone, *Commentaries* §§ 151–52 (emphasis added). Blackstone wrote primarily in reference to the English licensing system of the seventeenth century, under which "nothing could be printed without prior approval from the state or church authority." Gold, *supra* note 13, at 245.

**19.** *See Konigsberg v. Time, Inc.,* 288 F.Supp. 989 (S.D.N.Y.1968) ("To enjoin any publication, no matter how libelous, would be repugnant to the First Amendment to the Constitution."); *Krebiozen Research Foundation v. Beacon Press, Inc.,* 334 Mass. 86, 93, 134 N.E.2d 1, 6 (1956) ("[T]he constitutional protection of free speech and public interest in the discussion of many issues greatly limit the areas in which the power to grant injunctive relief may or should be exercised in defamatory cases."); *Northwestern Pac. R. Co. v. Lumber & Sawmill Workers' Union,* 31 Cal.2d 441, 189 P.2d 277, 282 (1948) ("[Equity] will not restrain the commission of a libel or slander, for that is prior censorship—a basic evil denounced by the constitutions of the United States and California in protecting freedom of speech and press."). *See generally* Annotation, *Injunction as Remedy Against Defamation of Person,* 47 A.L.R.2d 715, 726–27 (1956) ("The most formidable obstacle to the grant of injunctive relief against personal defamation in this country has been the feeling of the courts that to allow such relief would infringe the constitutionally guaranteed freedoms of speech and of the press by setting up what would be, at least potentially, a system of judicial censorship."); Bertelsman, *supra* note 13 at 323 ("[T]he constitutional problem of prior restraint ... has proved to be the most formidable obstacle to the granting of injunctive relief in cases involving speech or writing.").

**20.** Article I, section 7 provides in pertinent part:

The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.

the Court's own decision in *Goldman Theatres v. Dana,* 405 Pa. 83, 173 A.2d 59, *cert. denied,* 368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961).[21]

Second, the Supreme Court addressed the Superior Court's argument that Mazzocone and Quinn did not have an adequate remedy at law because Willing was indigent and unable to satisfy a damages action. In unequivocal terms, the Supreme Court stated that Willing's constitutional rights should not be contingent upon her financial status.

> We cannot accept the Superior Court's conclusion that the exercise of the constitutional right to freely express one's opinion should be conditioned upon the economic status of the individual asserting that right. Conditioning the right of free speech upon the monetary worth of an individual is inconsistent not only with fundamental principles of justice developed by the Supreme Court of the United States and guaranteed by the Federal Constitution, but also violates our own constitution's express admonitions that "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights ...", and that "[n]either the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right."

*Id.,* 393 A.2d at 1158 (citations omitted).

The Supreme Court added that, as a matter of common-law precedent, the Superior Court had been wrong in assuming that Willing's indigency in any way was relevant to determining whether Mazzocone and Quinn had an adequate remedy at law.

In Pennsylvania the insolvency of a defendant does not create a situation where there is no adequate remedy at law. In deciding whether a remedy is adequate, it is the remedy itself, and not its possible lack of success that is the determining factor. "The fact, if it be so, that this remedy may not be successful in realizing the fruits of recovery at law, on account of the insolvency of the defendants, is not of itself or [sic] ground of equitable inference."

*Id.* (citations omitted).

Justice Roberts's concurrence in *Willing* reiterated the majority's rationale that Mazzocone and Quinn had an adequate remedy at law, notwithstanding Willing's insolvency. *Id.,* 393 A.2d at 1159. His concurrence also argued, by reference to relevant United States Supreme Court precedents,[22] that the injunction issued against Willing constituted a classic prior restraint on speech in violation of both the Pennsylvania and United States Constitutions. *Id.* Justice Roberts also expanded upon the majority's analysis, and refuted another of the Superior Court's rationales for upholding the injunction, arguing that the injunction violated Willing's right to trial by jury.

> As a consequence of holding that the defendant's indigency creates equitable jurisdiction, the Superior Court conditions appellant's right to trial by jury on her economic status. One of the underlying justifications for equity's traditional refusal to enjoin defamatory speech is that in equity all questions of fact are resolved by the trial court, rather than the jury. Thus, it deprives appellant of her right to a jury trial on the issue of the truth or falsity of her speech. The right to trial by jury is more than mere

---

Pa. Const., Article I, section 7 (Purdon 1969).

**21.** In *Goldman,* the Pennsylvania Supreme Court declared unconstitutional the Motion Picture Control Act of 1959, which had empowered the governor to appoint a board of three censors who had the authority to ban the showing, under threat of prosecution, of any motion picture that they considered to be obscene. The Court struck down the Act as a prior restraint on speech in violation of Article I, section 7 of the Pennsylvania Constitution, and as an infringe-

ment of the right to trial by jury under Article I, sections 6 and 9 thereof.

**22.** *See Near v. Minnesota,* 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); *Carroll v. President and Comm'rs of Princess Anne,* 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971); *New York Times Co. v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971).

form. Indeed the right to a jury trial is guaranteed by this Commonwealth's Constitution.

*Id.* (citations omitted).

In short, *Willing* may be summarized as follows. The Superior Court was presented with a case which, in its view and that of many of the commentators, cried out for reexamining the common-law precept that equity will not enjoin a defamation. The Superior Court, after carefully considering each of the traditional justifications for the precept, found one no longer viable and the remaining three unpersuasive given the certainty that Willing's statements were false, the likelihood that she would continue to issue libelous statements, her inability to satisfy a damages judgment, and the fact that the public had little interest in the speech at issue. The Supreme Court, however, stood firmly behind the traditional bar to equitable relief, holding essentially that Willing's constitutional rights to uncensored speech and trial by jury were paramount even though, as a practical matter, she would be immune to a damages action after the speech were issued.[23]

Given the similarities between *Willing* and the instant dispute, and the Pennsylvania Supreme Court's flat rejection of the Superior Court's avoidance of the traditional rule against enjoining defamation, it arguably would be appropriate to overturn the district court's injunction against Thompson without further elaboration. We believe, however, contrary to Thompson's assertions, that there is a material difference between the two cases that makes further analysis unavoidable.

As noted previously, *Willing* originated when Mazzocone and Quinn filed a suit in equity in the Court of Common Pleas of Philadelphia seeking to enjoin Willing's defamatory protest. The two lawyers never sought damages, nor did a jury ever pass upon the veracity of Willing's statements.

The Common Pleas judge, satisfied that the statements obviously lacked foundation and that Willing was mentally imbalanced, issued the injunction based entirely upon his view of the situation and his equitable powers. Thompson, by contrast, was enjoined from further defamatory speech as an adjunct to Kramer's successful action at law for damages. Because the district court directed a verdict in Kramer's favor on the issue of liability, leaving to the jury only the issue of damages, we recognize that it is not entirely accurate to state that Thompson was afforded a jury determination as to the veracity of his statements. However, since the directed verdict is functionally equivalent to a jury award, at least in theory Thompson's comments were found to be libelous after a full and fair jury trial.[24]

The existence of a jury trial is a potentially crucial distinction between *Willing* and this case. Two of the three traditional reasons for barring equity from enjoining a defamation, as rescribed by the Pennsylvania Supreme Court in *Willing*, are obviated once a jury has determined that the enjoined statements are indeed libelous. First, it obviously cannot be said that a defendant has been denied the right to a jury determination of the veracity of his statements if a judge issues an injunction against further statements *after* a jury has determined that the same statements are untrue and libelous. Second, not all injunctions against speech constitute prior restraints. The United States Supreme Court has held repeatedly that an injunction against speech generally will not be considered an unconstitutional prior restraint if it is issued after a jury has determined that the speech is not constitutionally protected. *See, e.g., Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Rel.*, 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973) ("The special vice of a prior restraint is that communication will

---

**23.** We have found no relevant cases decided by the Pennsylvania Supreme Court since *Willing*. The Superior Court, however, has twice overturned injunctions against defamation on the authority of *Willing*. *See Johnson v. Pilgrim Mutual Ins. Co.*, 284 Pa.Super. 314, 425 A.2d 1119 (Pa.Commw.Ct.1981); *Franklin Chalfont Assoc. v. Kalikow*, 392 Pa.Super. 452, 573 A.2d 550 (1990).

**24.** We elaborate on the ramifications of a directed verdict in this context, *infra* at 678.)

be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.").[25] The Pennsylvania cases appear to be in accord.[26] Because libelous speech is not protected by either the United States or the Pennsylvania Constitutions, *see Beauharnais v. Illinois*, 343 U.S. 250, 266, 72 S.Ct. 725, 735, 96 L.Ed. 919 (1952); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 387, 94 S.Ct. 2997, 3030, 41 L.Ed.2d 789 (1974) (White, J., dissenting); *Commonwealth v. Acquaviva*, 187 Pa.Super. 550, 145 A.2d 407, 411 (1958) (*per curiam*); *Commonwealth v. King*, 33 Pa.D. & C.2d 235, 238 (1963), it follows that, once a jury has determined that a certain statement is libelous, it is not a prior restraint for the court to enjoin the defendant from repeating that statement.

Mindful of our responsibility to predict how the Pennsylvania Supreme Court would decide this case under its laws and Constitution, the case appears to be reducible to the following question: Would the Pennsylvania Supreme Court have upheld the injunction against Willing if Mazzocone and Quinn had first obtained a jury determination that her statements were libelous? Stated more broadly, would the Pennsylvania Supreme Court be willing to permit an exception to the rule that equity will not enjoin a defamation in cases where there already has been a jury determination that the defendant's statements were libelous?

Although this is apparently a question of first impression under Pennsylvania law, it has been considered in other jurisdictions. To begin with, our research reveals four Missouri cases that suggest in *dicta* that an injunction can issue against further publication of defamatory statements once the plaintiff had secured a jury verdict. *See Flint v. Hutchinson Smoke Burner Co.*, 110 Mo. 492, 19 S.W. 804, 806 (1892); *Wolf v. Harris*, 267 Mo. 405, 184 S.W. 1139, 1141–42 (1916); *Ryan v. Warrensburg*, 342 Mo. 761, 117 S.W.2d 303, 308 (1938); *Downey v. United Weatherproofing Inc.*, 363 Mo. 852, 253 S.W.2d 976, 983 (1953). On the strength of these cases, an A.L.R.2d Annotation, published in 1956, observed:

> It may be argued that the constitutionally guaranteed rights of free speech and trial by jury are not infringed by equitable interference with the right of publication where the defamatory nature of the publications complained of has once been established by a trial at law, and the plaintiff seeks to restrain further similar statements.

Annotation, *Injunction as Remedy Against Defamation of Person*, 47 A.L.R.2d 715, 728 (1956).

---

**25.** *Pittsburgh Press* is but one in a series of Supreme Court decisions, written since the landmark prior restraint decision in *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931), which have held that an injunction against speech is not a prior restraint if issued in conjunction with well-defined procedural guidelines to ensure against governmental censorship of protected speech. *See Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469 (1957); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963); *Freedman v. Maryland*, 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965); *Carroll v. President and Comm'rs of Princess Anne*, 393 U.S. 175, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). Although these cases differ somewhat over the extent of procedural safeguards necessary to avoid a charge of prior restraint, they all appear to agree that a full jury determination as to the protected status of speech is adequate to support the issuance of an injunction.

**26.** *See, e.g., Brightbill v. Rigo, Inc.*, 274 Pa.Super. 315, 418 A.2d 424 (Pa.Commw.Ct.1980), involving an enforcement action by the district attorney of Lebanon County under the Pennsylvania Obscenity Statute. After a jury trial at which fifteen magazines and five movies previously sold by the defendant, the owner of an adult book store, had been determined by a jury to be obscene, the prosecutor obtained an order from the trial court enjoining the defendant from selling or exhibiting any "like or similar" materials. The Superior Court reversed the injunction, holding that the sale of particular magazines and movies could be enjoined, but only after a specific determination by a jury that each was obscene. *See also William Goldman Theatres, Inc. v. Dana*, 405 Pa. 83, 173 A.2d 59, 65 (1961) ("[O]ne accused cannot constitutionally be punished for the utterance of alleged obscene matter except upon a finding by an impartial jury of the vicinage that the matter was in fact obscene. . . .").

This point was more strongly stated in an Am.Jur. entry in 1969, again relying solely on the Missouri cases and the A.L.R.2d Annotation:

> After a plaintiff has, by a judgment at law, established the fact that certain published statements are libelous, he may, on a proper showing, have an injunction to restrain any further publication of the same or similar statements.

42 Am.Jur.2d *Injunctions* § 135, at 892 (1969).[27]

In 1975, the Supreme Courts of Ohio and Georgia became the first courts clearly to adopt this exception to the general rule that equity will not enjoin a defamation. See *O'Brien v. University Community Tenants Union*, 42 Ohio St.2d 242, 327 N.E.2d 753 (1975); *Retail Credit Co. v. Russell*, 234 Ga. 765, 218 S.E.2d 54 (1975). *O'Brien* was instituted by a landlord who claimed that he was being defamed and blacklisted by a tenants' group. The landlord secured a jury determination that certain statements were libelous and then sought and obtained an injunction against further libel. The Supreme Court of Ohio affirmed the injunction stating:

> Once speech has judicially been found libelous, if all the requirements for injunctive relief are met, an injunction for restraint of continued publication of that same speech may be proper. The judicial determination that specific speech is defamatory must be made prior to any restraint.

327 N.E.2d at 756.

In *Retail Credit*, the plaintiff, the subject of a credit report containing statements adjudged libelous by a jury, obtained a permanent injunction prohibiting the defendant from republishing the libelous statements. The Georgia Supreme Court, relying largely on the United States Supreme Court's opinion in *Pittsburgh Press*, *see supra* at 676, upheld the injunction on

the ground that the injunction was not a prior restraint because "prior to the issuance of the injunction 'an adequate determination [was made] that it is unprotected by the First Amendment.'" 218 S.E.2d at 63.

Nearly a decade later, the Minnesota Supreme Court followed suit in *Advanced Training Systems v. Caswell Equipment Co.*, 352 N.W.2d 1 (Minn.1984). That court held:

> A judicial tribunal has, after full adversarial proceedings, found that defendant's criticism of [plaintiff's] equipment constituted 'false or misleading' product disparagement.... Other courts have also upheld the suppression of libel, so long as the suppression is limited to the precise statements found libelous *after* a full and fair adversary proceeding. We therefore hold that the injunction below, limited as it is to material found either libelous or disparaging after a full jury trial, is not unconstitutional and may stand.

352 N.W.2d at 11 (citations omitted).

We find the reasoning and policies undergirding these cases quite persuasive. But that is not dispositive here. Our function is to look, as best we can, into the minds of the members of the Pennsylvania Supreme Court, and to ascertain their likely disposition of this case. Although the prediction is difficult, the available evidence leads us to the conclusion that the Pennsylvania Supreme Court would overturn the injunction against prospective libel issued by the district court against Thompson. In reaching this conclusion, we are persuaded by five factors.

First, the maxim that equity will not enjoin a libel has enjoyed nearly two centuries of widespread acceptance at common law. The welter of academic and judicial criticism of the last seventy years has, in truth, done little more than chip away at its

---

**27.** Interestingly, Judge Jacobs's dissent from the Superior Court's affirmance of the injunction in *Willing*, while bemoaning the majority's abandonment of the traditional rule that equity will not enjoin a defamation, quoted this Am.Jur. passage as an example of accepted exceptions to the general rule. *See Willing*, 369 A.2d at 836.

Although the Supreme Court of Pennsylvania ultimately adopted much of Judge Jacobs's reasoning supporting the view that the traditional rule should apply, at least on the facts of that case, the Court never stated whether it concurred in his view concerning this exception.

edges. In any event, as evidenced by the Pennsylvania Supreme Court's unqualified rejection of the Superior Court's "modern" view in *Willing*, Pennsylvania would appear firmly bound to the traditional rule. This may well be due to the extraordinary reverence and solicitude with which the Commonwealth of Pennsylvania has viewed the right of free expression, tracing back to the experiences in England of its founder William Penn[28] and carried forward in the Commonwealth's various Constitutions.[29] This adherence to the common law also may reflect that Pennsylvania's jurisprudence is wedded to preserving limitations on equitable relief that are elsewhere out of date. Whatever the reason, the fact remains that the Supreme Court of Pennsylvania appears entirely comfortable with the common-law bar; hence, we must tread lightly and carefully before recognizing an exception to this general rule in a diversity case turning on Pennsylvania law.

Second, although an exception to the general rule has been recognized in several cases where there has been a jury determination of the libelous nature of specific statements, we would do well not to overstate the degree of acceptance that has been accorded to this exception. For the better part of this century, this exception existed, as best we can determine, only in Missouri, and there based entirely on a single line of *dicta.* That three state supreme courts have affirmatively adopted the exception in the last two decades may represent the trickle that presages the collapse of the common-law dam. But, for now, it remains a trickle. And as far as we can tell, the Pennsylvania Supreme Court is more likely to plug the holes in the dam than to contribute to its destruction.

Third, even if we thought that the Pennsylvania Supreme Court might be inclined

**28.** Penn was jailed several times for the expression of his views while still in England. In the most famous of these incidents, Penn and a compatriot, William Mead, were arrested in 1670 for addressing an unlawful assembly of Quakers in Grace Church Street after the Crown had ordered their meeting house locked. The two were tried in London before a jury, which, to the great displeasure of the court, found that the defendants had spoken in the street but that they were not guilty of any criminal offense. Unable to persuade the jury, notably one particularly obstinate juror named Bushell, to reconsider its verdict, the court ordered that the jurors themselves be fined and imprisoned for two days. The jurors were released on writ of habeas corpus after the Chief Justice of the Court of Common Pleas held, in the landmark *Bushell's Case,* 124 Eng.Rep. 999, 1006 (Vaughan 1670), that a court may not order a jury to reach a criminal verdict against its convictions. *See The Trial of William Penn,* 6 Litigation 35 (Winter 1980); *see also Commonwealth v. Contakos,* 499 Pa. 340, 453 A.2d 578, 580–82 (1982) (noting, *inter alia,* the relationship between the trial of Penn and the importance ascribed to the openness of trials in Pennsylvania).

**29.** Since the founding of the Commonwealth, Pennsylvania's Constitutions have clearly provided for individual rights to freedom of speech and of the press. The original Constitution of the Commonwealth of Pennsylvania, adopted in 1776, contained a Declaration of the Rights of the Inhabitants of the State of Pennsylvania, clause XII of which stated:

That the people have a right to freedom of speech, and of writing, and publishing their sentiments; therefore the freedom of the press ought not to be restrained. Pa. Const. of 1776, cl. XII.

Section 35 of the Constitution of 1776 further stated:

The printing presses shall be free to every person who undertakes to examine the proceedings of the legislature, or any part of government. *Id.,* cl. 35.

These two provisions were merged and expanded in Article IX, section 7 of the Constitution of 1790, which stated in pertinent part:

The printing-presses shall be free to every person who undertakes to examine the proceedings of the legislature or any branch of government; and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man; and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty....

With very minor alterations, that language was readopted in Article IX, section 7 of the Constitution of 1838, and Article I, section 7 of the current Constitution of 1874. It is noteable that these provisions are far more expansive than the First Amendment to the United States Constitution which is stated solely in negative terms, i.e., that "Congress shall make no law ... abridging the freedom of speech...." We note additionally that, in the view of at least one Pennsylvania trial court, Article I, section 7, of the Pennsylvania Constitution does prohibit injunctive relief against defamation, *see Frick v. Stevens,* 43 Pa.D. & C.2d 6, 34–36 (1967).

to adopt the jury determination exception, we doubt that this is the case in which it would do so. The district court in this case took the decidedly unusual step of directing a verdict on the issue of liability against Thompson before he put on a defense, finding that the statements were so patently libelous that no justification or defense could possibly exist. In theory, of course, a directed verdict at law is tantamount to a jury verdict. From the defendant's perspective, however, a directed verdict is indistinguishable from the decree of a court sitting in equity. Given the fear of judicial censorship that has pervaded this area of jurisprudence, and the almost talismanic significance that the case law attaches to the decisions of juries, we think it likely that, even if the Pennsylvania Supreme Court were willing to adopt this exception, it would do so only when there *actually* has been a jury determination regarding the libelous nature of the defendant's statements.[30]

Fourth, and perhaps most importantly, we believe that the Pennsylvania Supreme Court would not adopt the jury determination exception if confronted with this case because, as *Willing* pointedly suggests, that Court continues to place great emphasis on the adequate remedy doctrine as a bar to equitable relief. Indeed, even a jury determination that particular statements are libelous does not address the traditional notion that equity should not intervene where legal remedies (i.e., damages) are adequate, either in practice or even just in theory. Although we find the Superior

Court's reasoning quite persuasive, and while at least one commentator has taken the Pennsylvania Supreme Court to task for its adherence to what he views as the outdated adequate remedy rule in *Willing*,[31] that court's decision in *Willing*, we believe, quite clearly reflects its continuing adherence to the adequate remedy rationale for denying injunctive relief.

Whether or not that court would have felt less passionately about the adequate remedy rule had it been satisfied that the rights to trial by jury and free speech were not also implicated is difficult to discern. In the end, we can do no more than take the *Willing* court's words at face value. From our reading, we must conclude, on balance, that the court was sufficiently transfixed by brooding emanations from Pennsylvania's history and the various constitutional provisions pertaining to free speech, and was sufficiently concerned about the encroachment of equity upon legal remedies, and in particular about the selective invocation of equitable remedies against indigent defendants, that it would have denied an injunction even on the facts of this case.

Fifth and finally, we note that this case presents a stronger case than *Willing* for denying equitable relief. Unlike Willing, there has been no showing that Thompson is indigent (the record suggests that he is moderately affluent), or that the threat of future damages is inadequate to deter him or to compensate Kramer. Therefore, even under the liberal standards for granting equitable relief urged by the Superior

---

**30.** We note in this regard that, consistent with Fox's Act, discussed *supra* note 15, the last clause of Article I, section 7, of the Pennsylvania Constitution states that "in all indictments for libels *the jury* shall have the right to determine the law and the facts, under the direction of the court, as in other cases." (Emphasis added.)

**31.** *See* Gold, *supra* note 13, at 243 n. 46:

The Pennsylvania Supreme Court declared that in determining the adequacy of a legal remedy, the existence of the remedy itself is dispositive, and not whether it is likely to succeed. In support of this conclusion, the Pennsylvania court cited *Bersch v. Rust*, 249 Pa. 512, 95 A. 108 (1915) and *Heilman v. Union Coal [Canal] Co.*, 37 Pa. 100 (1860).

Plainly, when these two cases were decided, careful distinctions between courts of law and equity were still being observed. As these distinctions are no longer relevant today, the validity of the Pennsylvania court's analysis becomes questionable....

Gold continued:

[N]otwithstanding the manifest inadequacy of the legal remedy ..., the Pennsylvania court refused to provide the limited equitable protection sought by the plaintiff. Ironically, then, this formalistic reliance on an age-old equitable maxim, rather than doing justice, deprived the plaintiffs of all forms of redress and permitted the defendant to continue to act with impunity.

*Id.* at n. 243.

Court in *Willing*, 393 A.2d at 1158, an injunction probably would be inappropriate in this case.[32] And certainly, given the Pennsylvania Supreme Court's rigid adherence to the traditional adequate remedy rule, Kramer's prospects for securing an injunction from that court seem slim.

For the foregoing reasons, we will reverse those portions of the district court's orders that enjoined Thompson from repeating the statements deemed libelous and from communicating with anyone doing business with Kramer.

B. *Mandatory Retraction and Withdrawal of Prior Statements and Court Filings*

 We need not tarry very long over those portions of the district court's orders that sought to force Thompson to write letters of retraction to recipients of prior libelous statements and to withdraw libelous court filings. We have reviewed the available literature and reported decisions. Although the notion of *compelled* retraction occasionally has been advanced in the literature,[33] we have not found a single case in which such a remedy has been awarded.

Many states have enacted statutes that provide for the mitigation of compensatory or punitive damages in cases where a libel defendant, typically a newspaper, *voluntarily* retracts prior to trial. *See Taylor v. Hearst*, 107 Cal. 262, 40 P. 392 (1895); Leflar, *supra* note 13, at 436–41; Note, *Developments in Defamation, supra* note 13, at 940–42. No statutes to our knowledge, however, *compel* retraction. The reasons for the reluctance of state legislatures and courts to provide for mandatory retraction are apparent enough. As one commentator has stated:

> None of the statutes provide for a compulsory retraction ...; they all leave it up to the defamer as to whether he will retract, even after formal demand from the defamed person. Retraction is a defense, not an award in the plaintiff's favor.
>
> Compulsory retraction has obvious defects. The sincerity of a compelled retraction may be doubted, and by reason of that fact it may fall short of achieving real vindication for the defamed person. Third persons may feel that the defamer is merely saying what the law requires him to say without changing his true opinion.

*See* Leflar, *supra* note 13 at 440.[34]

This is not to suggest that policy reasons alone have discouraged legislatures and

---

**32.** *See, e.g., Greenberg v. De Salvo*, 254 La. 1019, 229 So.2d 83 (1969). That case involved a defamed lawyer and very much resembled the instant dispute. Greenberg obtained a jury verdict for damages, establishing that De Salvo's statements that he was "a crook," "a crooked lawyer," and "a slimy kike," were libelous. The trial court also issued a permanent injunction barring De Salvo from repeating these statements. The Supreme Court of Louisiana overturned the injunction stating that the "[t]he writ of injunction, being a harsh, drastic, and extraordinary remedy, should issue only where the party seeking same is threatened with irreparable loss or injury without adequate remedy at law." 229 So.2d at 86. Unlike the Pennsylvania Supreme Court in *Willing*, the Louisiana Supreme Court did not assume that the mere theoretical availability of damages constituted adequate relief. The court appeared willing to uphold Greenberg's injunction if he could show that damages were indeed inadequate. However, after reviewing the record, the court concluded that:

> [Greenberg] has not proved an immediate threat of a multiplicity of suits; he has not proved that he has no legal remedy; he has

not proved a conspiracy or coercion. [He] has not proved that [the defendant] is insolvent; he has not proved that she will be unable to respond in damages if in the future they are assessed against her.... [He] has not proved that he will suffer irreparable injury, loss, or damage. Under such findings, we conclude that this is not a matter for the administration of equity. [Greenberg] has not made a proper showing that this matter justifies the issuance of the harsh remedy of injunction. [He] has an adequate remedy at law if in the future he feels he is suffering from slander and libel allegedly committed by [the defendant].

229 So.2d at 88.

**33.** *See* Leflar, *supra* note 13, at 440–41; Chafee, *supra* note 13, at 26; Note, *Vindication of the Reputation of a Public Official*, 80 Harv.L.Rev. 1730, 1739–43 (1967); Note, *Developments in Defamation, supra* note 13, at 940.

**34.** Another commentator similarly has observed:

> A full retraction by the defamer, given the same publicity as the original publication, is

courts from invoking this remedy. Commentators have raised a serious question, related to the prior discussion of prospective injunctions but as yet substantially less debated, whether compelled retraction could withstand first amendment scrutiny. For example, Professor Chafee has written:

> Since courts often base their refusal of injunctions in libel cases on the constitutional right of free speech, it is doubtful whether even a statute could make compulsory retraction valid.... [I]t may very well be a serious invasion of liberty of the press to compel a newspaper to publish as true what the editor believes to be false. And that is what a retraction is, if the editor persists in thinking his supposed libel correct.

Chafee, *supra* note 13, at 26. *See also* Hulme, *supra* note 13, at 387–88 ("Although retraction may provide a quick and efficient remedy, the availability of this remedy depends entirely upon the defendant's cooperation; he cannot legally be compelled to issue a retraction.").

To our knowledge, the only two cases that even remotely come close to addressing mandatory retraction are *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), and *Coughlin v. Westinghouse Broadcasting and Cable, Inc.*, 689 F.Supp. 483 (E.D.Pa.1988). In *Miami Herald*, the Supreme Court was called upon to assess the constitutionality of a Florida statute that provided a so-called "right of reply" to political candidates whose personal or official records were assailed by the media. Under the statute, newspapers were required to print, free of cost to the candidate, and subject to punishment if they refused, any reply that a candidate wished to make to the newspapers' charges. The Court declared the statute unconstitutional stating:

> [T]he Court has expressed sensitivity as to whether a retraction or requirement

constituted the compulsion exerted by government on a newspaper to print that which it would not otherwise print. The clear implication has been that no such compulsion to publish that which " 'reason' tells them should not be published" is unconstitutional. A responsible press is an undoubtedly desirable goal, but press responsibility is not mandated by the Constitution and like many other virtues cannot be legislated.

*Miami Herald*, 418 U.S. at 256, 94 S.Ct. at 2838–39 (citations omitted).

A "right of reply" differs from a mandatory retraction in that the former merely requires the defamer to provide space for a reply, whereas the latter requires the defamer to mouth or pen the words the plaintiff would have him say. As such, the unconstitutionality of compelled retraction would seem to follow *a fortiori* from the Court's declaration that Florida's "right of reply" statute is unconstitutional. One might draw such an inference from *Miami Herald* were it not for the short and curious concurrence authored by Justice Brennan:

> I join the Court's opinion which, as I understand it, addresses only "right of reply" statutes and implies no view upon the constitutionality of "retraction" statutes affording plaintiffs able to prove defamatory falsehoods a statutory action to require publication of a retraction. *See generally* Note, *Vindication of the Reputation of a Public Official*, 80 Harv.L.Rev. 1730, 1739–1747 (1967).

*Id.* at 258–59, 94 S.Ct. at 2839–40 (Brennan, J. concurring). It is therefore difficult to know what to make of *Miami Herald* for purposes of our current inquiry.

*Coughlin* is also somewhat related to our inquiry. There, a policeman, who claimed that he had been defamed by a television station, wrote the management of the station demanding retraction, but

---

probably the best means of restoring the plaintiff's reputation. Although it has been argued that a court could, after a judgment of liability or guilt, use its contempt powers to force a retraction, this technique has not been utilized in the United States, possibly because of judicial reluctance to force an individual to make statements contrary to his convictions.

Moreover, a voluntary retraction appears better suited to undo the harm since a retraction forced by a court is less likely to convey the impression that the defendant sincerely believes his prior statements to be untrue.

Note, *Developments in Defamation, supra* note 13, at 940.

was rebuffed. Apparently unable to prove that the statements had been made with sufficient recklessness to support a typical damages action for libel, the policeman sought damages invoking the novel theory that the station had breached a common-law duty under Pennsylvania law to retract what it later knew to be false. The television station opposed the claim, arguing that such a cause of action would amount to mandatory retraction. The station argued that the Pennsylvania Supreme Court would not create such a cause of action, because it would contravene principles inhering in the first amendment, "which preclude giving directions to anybody as to what to publish." *Coughlin*, 689 F.Supp. at 489.

Judge Pollak reviewed the authorities speaking to the constitutionality of mandatory retraction, focusing on *Miami Herald* and the apparent conflict between the majority opinion and Justice Brennan's concurrence. He concluded, in *dicta*, that "[m]y view of the matter is that a carefully crafted retraction statute could well be constitutional." *Id.* at 489. Judge Pollak denied the plaintiff's claim, however, concluding that even if mandatory retraction would survive constitutional scrutiny, such a cause of action properly should originate with the Pennsylvania legislature, not the courts. *Id.* at 490. We agree.

In sum, we find no support for the various retractions and withdrawals forced upon Thompson by the district court. Consequently, those orders of the district court compelling such retractions and withdrawals, and the associated contempt citations, must be reversed.[35]

## III. CONCLUSION

For the foregoing reasons, we will reverse those portions of the orders of the district court, entered April 6, June 5, June 12, July 31, August 1, and August 24, 1990,

that permanently enjoined defendant from uttering libelous statements, mandated the retraction or withdrawal of past libelous statements, held defendant in civil contempt, and awarded plaintiff attorney's fees arising out of contempt proceedings. For the reasons stated in our companion memorandum opinion filed this day. The judgment awarding damages will be reversed and the case remanded for a new trial on damages.

---

**35.** Kramer argues that the district court's order of retraction was designed to compel Thompson merely to live up to the promise to retract that he uttered during trial in an attempt to lessen damages. In view of the foregoing discussion, this argument, even if factually correct, would not carry the day. At all events, we find no support for this argument in the record. Thompson's rambling and recalcitrant testimony hardly amounted to a promise to retract.

Moreover, the record reflects that when the issue of retraction was raised by the jury, the district court initially inquired of Thompson's lawyer whether he thought his client would consent to retract. Before the lawyer could respond, and before anyone consulted with Thompson himself, the district court announced that *it* would compel retraction regardless of Thompson's consent.