**[J-51-2023] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | |
|---|---|
| FREDERICK E. OBERHOLZER, JR. AND DENISE L. OBERHOLZER, | : No. 104 MAP 2022 |
| | : |
| | : Appeal from the Order of the |
| Appellees | : Superior Court at No. 794 EDA 2020 |
| | : dated April 18, 2022, Vacating the |
| | : judgment of the Montgomery County |
| | : Court of Common Pleas, Civil |
| v. | : Division, entered April 1, 2020, at |
| | : No. 2016-11267 and Remanding. |
| | : (The order of the Superior Court |
| SIMON AND TOBY GALAPO, | : dated April 5, 2022, withdrew the |
| | : March 7, 2022, memorandum.) |
| Appellants | : |
| | : ARGUED: October 17, 2023 |

**DISSENTING OPINION**

**JUSTICE WECHT**                                        **DECIDED: August 20, 2024**

In this appeal, Simon and Toby Galapo present two primary claims. First, they argue that the trial court's injunction is an unconstitutional prior restraint on speech. Second, they assert that the injunction violates "the so-called traditional rule that equity lacks the power to enjoin the publication of defamatory matter."[1] (The "no-injunction rule" for short.) Because the trial court's injunction in this case was not based on a theory of defamation, the Galapos urge us to adopt an unprecedented version of the no-injunction rule that would prohibit injunctions in all tort cases, not just in defamation actions.[2] Today, the Majority seems to resolve both appellate claims in the Galapos' favor. In so doing,

---

[1]     *Willing v. Mazzocone* ("*Willing II*"), 393 A.2d 1155, 1158 (Pa. 1978) (plurality).

[2]     Brief for the Galapos at 26 ("[I]t does not and should not matter whether a plaintiff bases his or her request for injunctive relief on allegations of defamation, false light, nuisance, or any other tort.").

the Majority obscures the important differences between the prior restraint doctrine and the no-injunction rule.[3]

In this dissent, I explore the history of the no-injunction rule and the reasons that modern courts have given for modifying or abandoning it. I then discuss the Majority's adoption of the no-injunction rule, its dramatic expansion of that rule to encompass torts other than defamation, and its separate conclusion that the present injunction is an unconstitutional prior restraint under Article I, Section 7 of the Pennsylvania Constitution.[4] I conclude ultimately that the injunction here is not a prior restraint and does not violate the no-injunction rule, a rule that in any event does not exist in Pennsylvania, and one that would not apply to this case even if it did exist here. Contrary to the Majority's analysis, equity courts possess the authority to issue certain kinds of narrow injunctions that restrict speech so long as those injunctions can withstand either intermediate scrutiny (for content-neutral injunctions) or strict scrutiny (for content-based injunctions). Because the instant injunction survives application of either standard, it should be upheld.

## I. History of the No-Injunction Rule

The no-injunction rule and Article I, Section 7's prohibition on prior restraints have distinct origins, with the former predating the latter.[5] The no-injunction rule, at least at its

---

[3] *See*, *e.g.*, Majority Opinion at 46 (expanding the no-injunction rule to encompass all torts "because the text of Article I, Section 7 does not distinguish between defamation or any other tort involving speech").

[4] *See* PA. CONST. art. I, § 7 ("The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.").

[5] Erwin Chemerinsky, *Injunctions in Defamation Cases*, 57 SYRACUSE L. REV. 157, 167 (2007) (explaining that the no-injunction rule "was established in eighteenth-century England, well before the American revolution"); David S. Ardia, *Freedom of Speech, Defamation, and Injunctions*, 55 WM. & MARY L. REV. 1, 18 (2013) ("The no-injunction rule has been a fixture of Anglo-American law for more than three centuries. Well before the First Amendment was ratified, it was taken as a given by judges and lawyers that (continued…)

inception, was not designed to protect free speech. It was a constraint on the jurisdiction of equity courts in England. "Due to the historical division between courts of law and courts of equity, [English] common law judges originally lacked the authority to grant any equitable relief."[6] Because English common law "courts had no power to grant injunctions, and courts of equity lacked the authority to adjudicate claims for defamation, the only remedy available for defamation was money damages at law."[7]

Early American courts invoking the common law no-injunction precept likewise treated the rule as a jurisdictional limitation on courts of equity.[8] Yet many of those same courts "continued to deny requests for injunctions targeting defamatory speech" on this basis even "long after law and equity courts had merged in most jurisdictions in the United States."[9] Broadly speaking, American courts adhering to the no-injunction rule cited one or more of the following three reasons for doing so. First, some courts believed that to allow a court of equity to decide whether speech is defamatory would be to intrude upon

---

injunctions, including permanent injunctions following trial, were not permissible remedies in defamation actions."); Note, *The Restraint of Libel by Injunction*, 15 HARV. L. REV. 734, 734 (1902) ("For one hundred and fifty years there has existed a tradition having the force of absolute law that equity has no jurisdiction to enjoin a libel.").

[6]     Ardia, *supra* note 4, at 20.

[7]     *Id.*

[8]     "When American courts initially invoked the no-injunction rule, the reason most often cited was the conviction that a court of law did not have *the power* to issue an injunction." *Id.* (emphasis added); *id.* at 21 ("American judges were quick to dismiss requests for injunctions directed at defamatory speech, and the earliest decisions almost uniformly did so on the basis that the court had no jurisdiction to grant equitable relief of any kind."); *Balboa Island Vill. Inn, Inc. v. Lemen*, 156 P.3d 339, 350 (Cal. 2007) (explaining that the no-injunction rule "was created more as an offshoot of a jurisdictional dispute than as a calculated understanding of the needs of a free press").

[9]     Ardia, *supra* note 4, at 21-22; *see* Eugene Volokh, *Anti-Libel Injunctions*, 168 U. PA. L. REV. 73, 90 (2019) ("Many past cases do say that 'equity will not enjoin a libel,' but that was a descriptive claim, describing a rule that no longer applies in many states.").

the role of the jury.[10]  Second, some courts reasoned that defamation plaintiffs already have an adequate remedy at law and therefore are not entitled to equitable relief.[11]  Third, some courts suggested that an injunction prohibiting further defamatory speech would be an unconstitutional prior restraint.[12]  Each of these distinct rationales for the no-injunction rule warrants closer scrutiny.

First, "[r]espect for the role of juries in free speech controversies played a seminal part in the adoption of the no-injunction rule by American courts."[13]  Because courts of law empaneled juries while courts of equity did not, a view emerged that allowing an equity court to enjoin speech that the court itself has determined to be defamatory would deprive defendants of their "right to have the truth or falsity of the issue determined by a

---

[10]  *Willing II*, 393 A.2d at 1159 (Roberts, J., concurring) ("One of the underlying justifications for equity's traditional refusal to enjoin defamatory speech is that in equity all questions of fact are resolved by the trial court, rather than the jury.  Thus, it deprives appellant of her right to a jury trial on the issue of the truth or falsity of her speech."); *Preston Hollow Cap. LLC v. Nuveen LLC*, 216 A.3d 1, 11 (Del. Ch. 2019) ("The original intent behind the rule was to give jurors, rather than judges, the ability to determine whether statements were defamatory.").

[11]  Under our legal standard governing permanent injunctions, a party seeking an injunction must demonstrate that they have a clear legal right to relief and no other adequate remedy at law, meaning that monetary damages are insufficient to make the plaintiff whole.  *Liberty Place Retail Assocs., L.P. v. Israelite Sch. of Universal Prac. Knowledge*, 102 A.3d 501, 505-06 (Pa. Super. 2014); *Mazzocone v. Willing ("Willing I")*, 369 A.2d 829, 832 (Pa. Super. 1976) (noting that one "argument often invoked for denying injunctive relief in defamation cases is that the plaintiff has an adequate remedy at law"), *overruled by Willing II*, 393 A.2d at 1158 (plurality).

[12]  *Willing I*, 369 A.2d at 832 ("The final reason frequently advanced for equity's reluctance to enjoin defamation is that an injunction against the publication would be unconstitutional as a prior restraint on free expression."), *overruled by Willing II*, 393 A.2d at 1158 (plurality).

[13]  Ardia, *supra* note 4, at 22 ("The aphorism that 'equity will not enjoin a libel' was essentially an assertion that a judge, acting alone, could not censor speech, and that juries were a necessary bulwark against government encroachment into fundamental liberties.").

jury trial as at common law."[14]  In a 1902 case, for example, this Court affirmed a lower court's refusal to exercise equity jurisdiction in a defamation case.[15]  We explained that, even in cases where the plaintiff lacks an adequate legal remedy such that the exercise of equity jurisdiction may be warranted, the defamation nevertheless "must be so clear as to be practically conceded, or it must first be established by the verdict of a jury."[16]

If the no-injunction precept is to be understood as a rule intended to protect the defendant's right to a jury trial, a distinction necessarily arises between preliminary and permanent injunctions.  Unlike preliminary injunctions, permanent injunctions can be issued after a jury has determined that the specific statements sought to be enjoined are in fact defamatory, or perhaps even after the defendant has waived his right to a jury trial by opting for a bench trial or by entering into a settlement agreement.  Assuming that the injunction goes no further than prohibiting the defendant from republishing the *exact* statement found or agreed to be defamatory, there can be no serious claim that the grant of an equitable remedy deprives the defendant of his right to a jury trial.  I stress that the narrowness of any injunction is key here, since an order restricting speech beyond that which was adjudged or agreed to be tortious would, in theory, deny the defendant his

---

[14]     Citizens' Light, Heat & Power Co. v. Montgomery Light & Water Power Co., 171 F. 553, 556 (C.C.M.D. Ala. 1909).

[15]     Baltimore Life Ins. Co. v. Gleisner, 51 A. 1024, 1024 (Pa. 1902).

[16]     *Id.* at 1024.

right to have a jury determine whether the additional statements are defamatory.[17]  But as long as the injunctions are crafted narrowly, they are upheld in most states.[18]

Turning to the notion that defamation plaintiffs are not entitled to an equitable remedy because they possess an adequate legal one, I believe that the Superior Court in *Willing I* justifiably was skeptical of this premise.[19]  Such a rule "would make an

---

[17]    University of North Carolina School of Law Professor David S. Ardia, whose scholarship has greatly informed my understanding of this case, has sorted injunctions into four categories based on their breadth.  Type I and Type II injunctions, which courts universally reject, prohibit the defendant from making "any statements" or "any defamatory statements" about the plaintiff.  Ardia, *supra* note 4, at 52-53.  Type III injunctions "prohibit a party from publishing certain enumerated statements about the plaintiff without limiting the injunction to the specific statements that have been found to be defamatory." *Id.* at 54.  For example, a Type III injunction "might order the defendant to take down an entire website, even though only a few statements on the site have been found to be defamatory." *Id.* at 54-55.  Lastly, a Type IV injunction "prohibits further publication, or orders the removal of the specific statements a court or jury has found are defamatory." *Id.* at 56.  In Professor Ardia's view, only Type IV injunctions are likely permissible. *Id.* at 58.  My own views dovetail with this broad protection of speech rights. *See S.B. v. S.S.*, 243 A.3d 90, 120 (Pa. 2020) (Wecht, J., dissenting).  Ironically, and inexplicably, this Court today extends unwarranted protection to the Galapos' speech, notwithstanding its recent denial of basic speech rights to the appellant mother in *S.B. Id.* at 107 (majority describing as content-neutral a gag order that prevented a mother (and her attorneys) in a contentious custody case from "speak[ing] publicly or communicat[ing] about" the case).  Readers will search in vain for a governing principle that can harmonize or reconcile these two majority opinions.

[18]    *See* Volokh, *supra* note 8, at 77 ("Thirty-four states allow such injunctions, at least in some situations, and only six have generally rejected them."); *id.* ("If 'equity will not enjoin a libel' was ever a firm rule, it isn't so now." (footnote omitted)); *McCarthy v. Fuller*, 810 F.3d 456, 464 (7th Cir. 2015) (Sykes, J., concurring) ("An emerging modern trend . . . allows for the possibility of narrowly tailored permanent injunctive relief as a remedy for defamation as long as the injunction prohibits only the repetition of the specific statements found at trial to be false and defamatory.").  As I explain in greater detail below, the requirement that the injunction restrict only speech adjudged to be defamatory also ensures that the injunction will not constitute an unconstitutional prior restraint.

[19]    *Willing I*, 369 A.2d at 832 (noting, among other things, that reputational damages may be difficult to prove or measure and that bringing repeated legal actions against an incessant defamer "would be a pointless gesture" when the defendant is judgment proof), *overruled by Willing II*, 393 A.2d at 1158 (plurality).

impecunious defamer undeterrable" because he could simply "continue defaming the plaintiff, who after discovering that the defamer was judgment proof would cease suing, as he would have nothing to gain from the suit, even if he won a judgment."[20] This would leave the defamer "free to repeat all their defamatory statements with impunity" and the defamed with "no remedy except to sue for damages and obtain another money judgment that they won't be able to collect."[21] This is not an adequate remedy. It is a purely theoretical one. Scholars rightly have criticized the notion that such an illusory entitlement to damages constitutes an adequate remedy at law.[22]

The adequate-remedy theory was never all that persuasive, and it has become even less so over time. As technology has lowered barriers to mass communication, assumptions that courts made in earlier eras have grown ripe for reexamination. In the 1980s, for example, "70 percent of all libel actions in the United States involved claims against the mass media," while such suits today are more likely to be filed against

---

[20] *McCarthy*, 810 F.3d at 462.

[21] *Id.*

[22] DOUGLAS LAYCOCK & RICHARD L. HASEN, MODERN AMERICAN REMEDIES 346 (5th ed. 2018) ("Does it make any sense at all to say that a damage judgment is adequate if it can never be collected? The Pennsylvania rule is in a tiny minority; it might not even be the rule in Pennsylvania if the issue were squarely presented outside a free speech context."); Estella Gold, *Does Equity Still Lack Jurisdiction to Enjoin A Libel or Slander?*, 48 BROOK. L. REV. 231, 243 (1982) ("[N]otwithstanding the manifest inadequacy of the legal remedy in [*Willing*], the Pennsylvania court refused to provide the limited equitable protection sought by the plaintiff. Ironically, then, this formalistic reliance on an age-old equitable maxim, rather than doing justice, deprived the plaintiffs of all forms of redress and permitted the defendant to continue to act with impunity."); RODNEY A. SMOLLA, 2 LAW OF DEFAMATION § 9:87 (2d ed. 1999 & Supp. 2024) ("The idea that damages are an adequate remedy at law begs the essential question—a convincing case can in fact be made that defamation is precisely the form of nonquantifiable injury for which damages are ill-suited, and that equitable relief would prevent reputational damage that might never be truly restored by money.").

judgment-proof bloggers, "citizen journalists," or social media users.[23] Furthermore, the lifespan of a defamatory statement today is now "essentially infinite" given that it "can live indefinitely on the Internet, waiting to be pulled up and recycled by a search engine."[24] This stands in stark contrast to the "relatively ephemeral stream of information" that was available when newspapers and television broadcasts dominated the media ecosystem.[25]

As the defendants in libel actions have changed, so too have the plaintiffs. "In past decades, the typical defamation plaintiff was a public official or public figure," but today, "given the ease with which information is published and shared online, many defamation plaintiffs are not so well known."[26] While such plaintiffs are at an advantage in that they need not prove actual malice to establish their defamation claims, "they still face the hard reality that their legal remedies are limited" in states that prohibit equitable remedies in defamation cases.[27] This is so because individual tortfeasors are much more likely than media organizations to be judgment-proof, and online intermediaries like social media

---

[23]    Ardia, *supra* note 4, at 11. "A database of libel lawsuits against bloggers maintained by the Media Law Resource Center, for example, revealed a 216 percent increase in cases filed between 2006 and 2009." *Id.* at 12; *id.* at 11 ("[S]o few defamation cases have been filed against the mass media in the past five years that several of the nation's leading media lawyers have suggested that libel law is dead. For example, George Freeman, vice president and assistant general counsel at The New York Times, says that for the first time in his twenty-nine years at the Times there are no active domestic libel suits." (footnotes omitted)); *see also* Eugene Volokh, *What Cheap Speech Has Done: (Greater) Equality and Its Discontents*, 54 U.C. DAVIS L. REV. 2303, 2306 (2021) ("Say what you will about the old mainstream media, but it didn't offer much of a voice to people obsessed with private grievances, or to outright kooks, or to the overly credulous spreaders of conspiracy theories. In 1990, someone who wanted to educate the world about an ex-lover's transgressions would have found it hard to get these accusations published, unless the ex-lover was famous.").

[24]    Ardia, *supra* note 4, at 17-18.

[25]    *Id.* at 17.

[26]    *Id.* at 12-13.

[27]    *Id.* at 13-14.

websites generally are not vicariously liable for the tortious speech of their users under Section 230 of the Communications Decency Act.[28]

As scholars have pointed out, the idea that an illusory right to monetary damages constitutes an "adequate" remedy has become increasingly tough to maintain as the Internet has made it easier than ever to defame.[29] And while the rule prohibiting courts from enjoining defamatory speech produces unjust outcomes in the Internet era, things could be even worse when the next wave of technology becomes mainstream.[30]

The final justification that courts have given for the rule that equity lacks jurisdiction to enjoin defamation is that a judicial order prohibiting the defendant from defaming the plaintiff would be an unconstitutional prior restraint.[31] A prior restraint is "a law, regulation

---

[28] *Id.* at 16 (explaining that Section 230 "grants operators of websites and other interactive computer services broad protection from defamation claims based on the speech of third parties, including protection from injunctive relief" (footnotes omitted)); *see* 47 U.S.C. § 230.

[29] *See* Erwin Chemerinsky, *Tucker Lecture, Law and Media Symposium*, 66 WASH. & LEE L. REV. 1449, 1451 (2009) ("The democratization of access to the media is inherently different than anything that has preceded it."). Although Dean Chemerinsky's earlier writings on the subject had embraced the idea that money damages constitute an adequate legal remedy in defamation cases, his views have evolved, at least "with regard to the Internet." *Id.* at 1460; *compare id.* ("I do not see any reason to continue the traditional rule that there can never be an injunction in defamation cases. I do not believe that damages will necessarily be an adequate remedy. There certainly can be an instance where the defendant has no assets and can continue to engage in the speech as long as they are willing to take the risk of a damage judgment against them. I think, though, that an injunction has to be narrowly tailored. It has to be limited to specific speech that is proven to be false."), *with* Chemerinsky, *supra* note 4, at 168-70 (arguing that damages are a sufficient remedy for plaintiffs in defamation cases).

[30] *See generally* Jessica Ice, *Defamatory Political Deepfakes and the First Amendment*, 70 CASE W. RSRV. L. REV. 417, 454 (2019) (arguing that "courts should draw lessons from both obscenity and copyright law to allow some narrowly crafted permanent injunctions against deepfakes").

[31] *Willing I*, 369 A.2d at 832 ("The final reason frequently advanced for equity's reluctance to enjoin defamation is that an injunction against the publication would be (continued…)

or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression."[32]  While I concede that some permanent injunctions certainly can be prior restraints, the notion that the prior restraint doctrine necessarily acts "as a constitutional bar to the granting of equitable relief against speech in an appropriate case has been greatly exaggerated."[33]  As explained above, an equity court crafting a permanent injunction theoretically could enjoin only the *exact statement* already adjudged to be defamatory, without sweeping any broader.[34]  Under a proper understanding of the prior restraint doctrine, such injunctions do not violate Article I, Section 7 or the First Amendment.[35]

Those who believe that the prior-restraint doctrine justifies the no-injunction rule do not mean literally to say that *every* conceivable order enjoining defamatory speech would be a prior restraint.  The idea instead is that, to avoid creating an unconstitutional prior restraint, an equity court would have to craft an injunction so narrow that it would not

---

unconstitutional as a prior restraint on free expression."), *overruled by Willing II*, 393 A.2d at 1158 (plurality).

[32]    *United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005).

[33]    William O. Bertelsman, *Injunctions Against Speech and Writing: A Re-Evaluation*, 59 KY. L. J. 319, 329 (1970).

[34]    *See supra* note 16 (discussing Professor Ardia's four categories of injunctions).

[35]    *See* Steve Tensmeyer, *Constitutionalizing Equity: Consequences of Broadly Interpreting the "Modern Rule" of Injunctions Against Defamation*, 72 N.Y.U. ANN. SURV. AM. L. 43, 60 (2017) ("[T]he modern view is simply that once a court has evaluated certain speech, it can enjoin repetitions of that speech."); *see, e.g., Balboa Island Vill. Inn*, 156 P.3d at 343 ("[A]n injunction issued following a trial that determined that the defendant defamed the plaintiff that does no more than prohibit the defendant from repeating the defamation, is not a prior restraint and does not offend the First Amendment.").

really stop a resolute defamer from continuing to harm the plaintiff.[36]  To borrow Dean Chemerinsky's pithy summation of the dilemma: "Any effective injunction will be overbroad, and any limited injunction will be ineffective."[37]  This is problematic because it is well-established that equity courts should refrain from issuing orders that have no chance of accomplishing their intended result.[38]  Proponents of the prior-restraint justification for the no-injunction rule also point out that, even if an injunction is limited to the statements already found to be defamatory, that does not necessarily mean that the statements will *always* be defamatory.[39]  Yet even this objection would seem to allow for some injunctions that restrict false statements *about past events*.[40]

## II. The Majority's Adoption and Expansion of the No-Injunction Rule

The notion that our common law imposes some blanket prohibition on equity courts enjoining defamatory speech has fallen out of favor with courts.  And for good reason.  Although jurists have attempted to justify the rule on many different grounds, none of the reasons given have been persuasive.  The adequate-remedy theory has been ridiculed by scholars.  The jury-trial objection does not explain why equity courts should be

---

[36]  Chemerinsky, *supra* note 4, at 171 ("An injunction that is limited to preventing repetition of the specific statements already found to be defamatory is useless because a defendant can avoid its restrictions by making the same point using different words without violating the court's order.").

[37]  *Id.*

[38]  *See New York Times Co. v. United States*, 403 U.S. 713, 744 (1971) (Marshall, J., concurring) ("It is a traditional axiom of equity that a court of equity will not do a useless thing[.]").

[39]  Chemerinsky, *supra* note 4, at 171 ("A statement that was once false may become true later in time.").

[40]  Tensmeyer, *supra* note 34, at 61 ("Chemerinsky's concern is that someone might be enjoined from making a statement that could become true if circumstances change, but this concern evaporates if the speech concerns only past events.  For example, the statement 'LeBron James has never won an NBA championship' is not only false, it will always be false.").

prohibited from entering *permanent* injunctions after a tort suit has been resolved on the merits. And the prior-restraint justification ignores the fact that a permanent injunction enjoining only the precise statement or statements already adjudged to be defamatory would not constitute a prior restraint.

One good thing about our precedent in this area is that this Court (before today) has never adopted the no-injunction rule. Although the rule "has been a fixture of Anglo-American law for more than three centuries,"[41] we have never applied it. Indeed, as best I can discern, this Court did not even mention the no-injunction rule until 1978, in *Willing II*. In nonbinding *dicta* in a nonbinding plurality opinion, the Court mentioned—but did not apply—what it labeled the "so-called traditional view that equity lacks the power to enjoin the publication of defamatory matter."[42] For reasons unknown, this stray reference to the "so-called traditional view" has stumbled forward, with some federal courts concluding incorrectly that the no-injunction rule is the law in Pennsylvania.

In *Kramer v. Thompson*,[43] for example, the United States Court of Appeals for the Third Circuit was called upon to predict whether this Court would "be willing to permit an exception to the rule that equity will not enjoin a defamation in cases where there already has been a jury determination that the defendant's statements were libelous."[44] Implicit in that question is a misunderstanding of Pennsylvania law. It makes no sense to ask whether this Court would embrace an exception to a rule that it has never adopted. The

---

[41]     Ardia, *supra* note 4, at 18.

[42]     *Willing II*, 393 A.2d at 1158 (plurality) ("Our resolution should also render unnecessary any discussion of the Superior Court's proposed exception to the so-called traditional view that equity lacks the power to enjoin the publication of defamatory matter.").

[43]     947 F.2d 666 (3d Cir. 1991).

[44]     *Id.* at 676.

Third Circuit's mistake is that it misinterpreted our decision in *Willing II* as adopting the no-injunction rule.[45] The *Kramer* Court opined that *Willing II* was an "unqualified rejection of the Superior Court's" decision in *Willing I*, which refused to apply the common law no-injunction rule.[46] That was incorrect. The lead opinion in *Willing II* explicitly did not base its conclusion on the no-injunction rule, although the three concurring justices would have done so.[47] The only principle that garnered the votes of four Justices in *Willing II* was the conclusion that the injunction in that case was an unconstitutional prior restraint.[48] *Willing II* established no precedent at all regarding the no-injunction rule.

The Galapos cite the *Kramer* court's misreading of our decision in *Willing II*—along with some other courts that have relied upon *Kramer*[49]—and claim that *Willing II* "adopted

---

[45]     *Id.* at 678 ("Whatever the reason, the fact remains that the Supreme Court of Pennsylvania appears entirely comfortable with the common-law bar; hence, we must tread lightly and carefully before recognizing an exception to this general rule in a diversity case turning on Pennsylvania law.").

[46]     *Id.*

[47]     *Willing II*, 393 A.2d at 1158 (plurality) ("Our resolution should also render unnecessary any discussion of the Superior Court's proposed exception to the so-called traditional view that equity lacks the power to enjoin the publication of defamatory matter."); *id.* at 1158-59 (Roberts, J., concurring) (disagreeing with "the Superior Court's radical departure from the long-standing general rule that equity will not enjoin a defamation"); *id.* at 1160 (Pomeroy, J., concurring) (incorporating by reference Judge Jacobs' Superior Court dissent); *see Willing I*, 369 A.2d at 835-37 (Jacobs, J., dissenting) (arguing that "the injunction issued in the case at bar" violates "the general rule that equity will not enjoin a defamation").

[48]     *See* Majority Opinion at 39 n.17 (noting that the concurring justices in *Willing II* agreed with the lead opinion's prior restraint analysis).

[49]     *See Puello v. Crown Heights Shmira, Inc.*, No. CIV.A. 3:14-0959, 2014 WL 3115156, at *2 (M.D. Pa. July 7, 2014) (citing *Kramer* for the proposition that Pennsylvania follows the common law rule that "equity will not enjoin a libel"); *Graboff v. Am. Ass'n of Orthopaedic Surgeons*, No. CIV.A. 12-5491, 2013 WL 1875819, at *5 (E.D. Pa. May 3, 2013) (denying injunction relief for a false light claim because "[t]he Third Circuit in *Kramer* predicted that the Pennsylvania Supreme Court will adhere to the traditional, common (continued…)

the common law notion that equity will not enjoin defamation."[50]  This claim is erroneous. The only Pennsylvania appellate court decision that even engages with the no-injunction rule is the Superior Court's persuasive repudiation of it in *Willing I*.[51]  Our pre-*Willing II* case law explains that injunctive relief may be available whenever it is "so clear as to be practically conceded" that the speech is defamatory, or when the defamation has been "established by the verdict of a jury."[52]  Thus, the only version of the no-injunction rule that could even arguably be consistent with this Court's precedent is the modern, limited approach that allows for certain narrowly crafted *permanent* injunctions.

Yet the Majority today adopts a no-injunction rule that appears to make no distinction between preliminary and permanent injunctions.[53]  That failure is indefensible. A no-injunction rule that categorically prohibits narrow permanent injunctive relief in defamation cases represents the minority approach among the fifty states and is inconsistent with our own precedent.[54]  The rule is also unjust insofar as it blocks equity

---

law principle that equity will not enjoin a defamation"); *Angelico v. Lehigh Valley Hosp. Inc.*, No. 1997-C-1671, 2005 WL 5163656 (Pa. Com. Pl. 2005) (citing *Kramer* and stating that, "in keeping with the venerable common-law rule that equity will not enjoin a defamation, courts of this Commonwealth will not accord injunctive relief to proscribe publication of libelous materials").

[50]    Brief for the Galapos at 25.

[51]    *Willing I*, 369 A.2d at 831 (concluding that "blind application of the [no-injunction rule] would be antithetical to equity's historic function of maintaining flexibility and accomplishing total justice whenever possible."), *overruled by Willing II*, 393 A.2d at 1158 (plurality).

[52]    *Balt. Life Ins. Co.*, 51 A. at 1024.

[53]    Majority Opinion at 46.

[54]    *See* Volokh, *supra* note 8, at 77; *Balt. Life Ins. Co.*, 51 A. at 1024.

courts from preventing further reputational damage that might never be adequately compensated by money damages.[55]

Sadly, it gets worse. Because the equity court's injunction in this case was not based on the theory that the Galapos' signs were defamatory, it is not enough for the Majority to simply adopt the disfavored theory that equity will not enjoin defamation. The Majority must also accept the Galapos' argument that the no-injunction rule bars injunctive relief that restricts speech in *all* tort cases, not just in defamation actions.[56] The Majority offers no persuasive justification for this expansive rule, which, again, is based entirely on the Third Circuit's misinterpretation of *Willing II*. The Majority does not scrutinize the Galapos' argument to any real extent; it reasons simply that the no-injunction rule should prohibit injunctions in all speech-related tort cases because "the text of Article I, Section 7 does not distinguish between defamation or any other tort involving speech."[57] As explained above, however, the no-injunction rule does not emanate from Article I, Section 7. So, the fact that Article I, Section 7 does not distinguish between different torts proves nothing.

---

[55] Keep in mind that it is typically not money damages that defamation plaintiffs really desire. Ardia, *supra* note 4, at 15-16 ("[R]esearch has shown that money is not what defamation plaintiffs want most. A study conducted in the 1980s by Professor Randall Bezanson found that only 20 percent of plaintiffs sued to obtain money as compensation for their reputational harms. Instead, Professor Bezanson's research revealed that what libel plaintiffs desire most is a correction or retraction." (footnotes omitted)). Indeed, the cost to litigate an average defamation case can easily exceed any provable economic loss stemming from the tort. David A. Anderson, *Is Libel Law Worth Reforming?*, 140 U. PA. L. REV. 487, 542 (1991) (stating that "[v]ery few libel plaintiffs suffer enough provable pecuniary loss to justify litigating" their case).

[56] Majority Opinion at 47 (holding that equity courts "generally lac[k] the power to grant injunctive relief" to enjoin speech "regardless of the nature of the underlying cause of action").

[57] *Id.* at 46.

In point of fact, the case for enjoining non-defamatory tortious speech or expressive activity is much stronger than the case for enjoining pure defamation.[58] Unlike in defamation cases—where the basis of the tort is the false statement itself—other torts such as intentional infliction of emotional distress, invasion of privacy, and nuisance are more likely to involve a combination of speech and conduct.[59] That likely explains why neither the Majority nor the Galapos are able to identify any state in the entire nation that has a no-injunction rule resembling the one that the Majority creates today.[60]

---

[58] SMOLLA, *supra* note 21, § 9:89 ("When the tortious conduct can be characterized as implicating torts other than defamation, injunctive relief tends to be more readily available.").

[59] *Id.* ("Where the defamation is incident to some other legal invasion for which injunctive relief is available, such as a trespass, or violent picketing, or fraud, both the larger tortious misconduct and the incidental defamation may be enjoined."); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 580 (5th Cir. 2005) (explaining that "courts do have the power to enjoin harassing communication" and "also have the power to enjoin repeated invasions of privacy"); *see generally Haverbush v. Powelson*, 551 N.W.2d 206, 207 (Mich. Ct. App. 1996) (upholding an injunction in an intentional infliction of emotional distress case).

[60] Misunderstanding a footnote in Professor Ardia's article on injunctions in defamation cases, the Majority suggests that six other states have constitutional prohibitions on "speech-related injunctions" resembling the one that the Majority creates today. Majority Opinion at 46 n.20. That's incorrect. In the quoted portion of his article, Professor Ardia is discussing state court decisions that could impede adoption of the "modern approach" to injunctions *in defamation* cases, whereby certain narrowly tailored injunctions are permissible so long as they are issued after a final determination that the speech is defamatory. Ardia, *supra* note 4, at 50 (stating that "no state supreme court has expressly rejected [the modern] approach as violative of the federal Constitution, although several courts have held that the free speech guarantees in their state constitutions pose an independent bar to injunctive relief *in defamation cases*." (emphasis added)).

Contrary to the Majority's assertion, none of the states that Professor Ardia identifies have bans on "speech-related injunctions" like the one that the Majority invents today. The Majority's claim that California and Montana have broad constitutional prohibitions on enjoining "speech" is especially risible, since those states have led the way in permitting injunctions in defamation cases. *Balboa Island Vill. Inn*, 156 P.3d at 352 (upholding an injunction on libelous speech); *St. James Healthcare v. Cole*, 178 P.3d 696, 705 (Mont. 2008) (citing *Balboa* and holding that "speech and conduct that is (continued…)

The Majority's embrace of this regrettable rule, at a time in which even the classic version of the rule has been widely questioned,[61] will rob equity courts of their power to award any measure of justice at all to tort victims who lack an adequate legal remedy. The Majority's response to my analysis is all bark and no bite. Seemingly acknowledging that the common law no-injunction rule has never been adopted in Pennsylvania, the Majority pretends instead that an identical prohibition exists as a matter of state constitutional law.[62] There is no support for that notion either. The Majority cites only *Willing II*, which applied no such rule. In an effort to suggest otherwise, the Majority describes the holding in *Willing II* in the broadest imaginable terms, insisting that "a four-

---

intended to embarrass, annoy, harass or threaten" may be enjoined). As for the other four states that the Majority cites, every one of them lacks judge-made rules resembling the broad and unforgiving one that the Majority creates today. *Kinney v. Barnes*, 443 S.W.3d 87, 99 (Tex. 2014) (declining to overturn the no-injunction rule but stating that the rule would not prevent an injunction prohibiting the defendant from *repeating* defamatory statements); *Sid Dillon Chevrolet-Oldsmobile-Pontiac, Inc. v. Sullivan*, 559 N.W.2d 740, 747 (Neb. 1997) (holding that injunctive relief may be available in defamation cases when there has been a prior adversarial determination that the speech in question was defamatory or when "injunctive relief is essential for the preservation of a property right"); *Vartech Sys., Inc. v. Hayden*, 951 So. 2d 247, 262 n.22 (La. App. 1 Cir. 2006) (stating that permanent injunctive relief is available in defamation cases "after a trial on the merits"); *see* Volokh, *supra* note 8, at 141 n.306 (citing several Missouri cases in which anti-libel injunctions were issued). If there existed any state court decisions establishing broad constitutional prohibitions on "speech-related injunctions," the Majority would surely cite them. It doesn't. Because it can't.

[61] *See*, *e.g.*, Erwin Chemerinsky, *Tucker Lecture, Law and Media Symposium*, 66 WASH. & LEE L. REV. 1449, 1460 (2009) ("I do not see any reason to continue the traditional rule that there can never be an injunction in defamation cases."); *Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 308 (Ky. 2010) ("Under the modern rule, once a judge or jury has made a final determination that the speech at issue is defamatory, the speech determined to be false may be enjoined."); *In re Conservatorship of Turner*, No. M2013-01665-COA-R3CV, 2014 WL 1901115, at *20 (Tenn. Ct. App. May 9, 2014) (unpublished) ("[W]e adopt the 'modern rule' and hold that defamatory speech may be enjoined after a determination that the speech is, in fact, false.").

[62] Majority Opinion at 47 n.20 ("To reiterate, the present question is whether Article I, Section 7—not the common law—generally prohibits courts from enjoining speech.").

Justice majority . . . held the enjoinment of speech is 'clearly prohibited by Article I, Section 7[.]'"[63]   That's true, of course, but only because those four Justices believed that the injunction was an unconstitutional prior restraint.[64]  There was not a four-Justice majority on the issue of whether equity can ever enjoin defamatory speech.[65]

Put simply, the holding in *Willing II* did not rest on the common law argument that equity courts lack the power to enjoin defamatory speech.  And the Court did not adopt a similar prohibition as a matter of state constitutional law either.  Moreover, even if the Court had adopted such a prohibition, that still would not support today's expansion of the no-injunction rule to cases involving torts other than defamation.  Regardless of whether we claim that today's new rule comes from the common law or—as the Majority implausibly insists—the Constitution, the fact remains:  there is no precedent supporting it.[66]

### III. The Majority's Prior Restraint Analysis

The Majority separately concludes that the injunction here is a prior restraint under Article I, Section 7 of the Pennsylvania Constitution.  Prior restraints are laws, regulations,

---

[63]     *Id.* at 39 n.17 (quoting *Willing II*, 393 A.2d at 1157).

[64]     The Majority itself seems to admit that the four Justices who made up the plurality in *Willing II* agreed only that the challenged injunction was a prior restraint.  Majority Opinion at 39 n.17 (noting that the concurring Justices in *Willing II* agreed with the lead opinion that the injunction was a prior restraint).

[65]     *See Willing II*, 393 A.2d at 1158 ("Our resolution should also render unnecessary any discussion of the Superior Court's proposed exception to the so-called traditional view that equity lacks the power to enjoin the publication of defamatory matter.").

[66]     The Majority's embrace of this unprecedented rule is an unforced error in the sense that the rule is entirely unnecessary to today's holding.  The Majority could have simply rested its decision on its separate conclusion that the injunction here is a prior restraint. *See* Majority Opinion at 45.  As I explain below, that conclusion is also wrong.  But it is at least rooted in our precedent, unlike the Majority's newly-invented prohibition on equitable relief.

or judicial orders that purport to restrict speech before it occurs.[67]  Because prior restraints prohibit speech before it has been disseminated, they are presumptively unconstitutional and have been upheld only in extraordinary circumstances not present here.[68]  Article I, Section 7 prohibits prior restraints on the right to speak, write, or print freely, but it also explicitly recognizes that citizens may be "responsible for the abuse of that liberty."[69]  A proper understanding of prior restraints therefore must distinguish between prior restraints and subsequent punishments.  A subsequent punishment is "a penalty imposed after the communication has been made as a punishment for having made it," whereas a prior restraint "would prevent communication from occurring *at all*."[70]  The latter is a prior restraint.  The former is not.

The Majority today embraces a conception of prior restraints so broad that it applies to all injunctions that even tangentially restrict free expression, whether before or after the expression occurs.  In the Majority's telling, an order preventing a defendant from continuing to repeat a tortious statement is a prior restraint, just as an order preventing a defendant from making the statement for the first time would be.[71]  While

---

[67]     *McCarthy*, 810 F.3d at 461-62 ("'Prior restraint' is just a fancy term for censorship, which means prohibiting speech before the speech is uttered or otherwise disseminated.").

[68]     *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("Any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity."); *Near v. Minnesota*, 283 U.S. 697, 716 (1931) (stating that prior restraints may be permissible in cases involving speech advocating for the overthrow of the government, incitements to violence, obscenity, and certain national security risks such as "the publication of the sailing dates of transports or the number and location of troops").

[69]     PA. CONST. art. I, § 7 ("The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.").

[70]     *William Goldman Theatres, Inc. v. Dana*, 173 A.2d 59, 70 (Pa. 1961) (Eagen, J., dissenting) (emphasis in original).

[71]     Majority Opinion at 45.

support for this conception of prior restraints can be found in *William Goldman Theatres*,[72] it is plainly wrong. At the heart of the prior restraint doctrine is the idea that "a free society prefers to punish the few who abuse rights of speech *after* they break the law [rather] than to throttle them and all others beforehand."[73] Narrowly tailored permanent injunctions do not throttle speakers before they break the law. Rather, they threaten subsequent punishment for repeat lawbreaking.[74] There is a fundamental difference between preventing someone from publishing something that allegedly *would be* tortious if published and threatening someone with contempt if they continue to publish something already found to be tortious.

The confusion in our case law no doubt stems from the United States Supreme Court's "occasional *dicta* suggesting that all injunctions are prior restraints," and these *dicta* have been recognized as "erroneous overgeneralizations."[75] Injunctions like the one before us that are "carefully focused, address a continuing course of speech, and are

---

[72] See William Goldman Theatres, 173 A.2d at 64.

[73] *Vance v. Universal Amusement Co.*, 445 U.S. 308, 316 n.13 (1980) (emphasis in original); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973) ("The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.").

[74] *Balboa Island Vill. Inn*, 156 P.3d at 339 ("Prohibiting a person from making a statement or publishing a writing *before* that statement is spoken or the writing is published is far different from prohibiting a defendant from *repeating* a statement or *republishing* a writing that has been determined at trial to be defamatory and, thus, unlawful. This distinction is hardly novel." (emphasis in original)).

[75] Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 DUKE L.J. 147, 170-71 (1998).

imposed after an opportunity for full merits consideration are not properly analyzed as prior restraints."[76]

I do not take issue with the result in either *William Goldman Theatres* or *Willing II*. Both of those cases plainly did involve prior restraints on speech. The injunction in *Willing II* was a preliminary injunction that sought to restrict certain speech before it was either adjudged or agreed to be tortious. Worse, the equity court's injunction in *Willing II* prohibited the defendant from making *any* "defamatory statements" about her former attorneys, meaning that the order plainly did restrict plenty of speech that had not yet occurred.[77] The statute in *William Goldman Theatres* was also a prior restraint because

---

[76] *S.E.C. v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 370 (D.C. Cir. 1988); *see also Sid Dillon Chevrolet-Oldsmobile-Pontiac, Inc. v. Sullivan*, 559 N.W.2d 740, 746 (Neb. 1997) ("Some jurisdictions have concluded that an order enjoining further publication of libelous or slanderous material does not constitute a prior restraint on speech where there has been a full and fair adversarial proceeding in which the complained of publications were found to be false or misleading representations of fact prior to the issuance of injunctive relief."); *Lothschuetz v. Carpenter,* 898 F.2d 1200, 1209 (6th Cir. 1990) (Wellford, J., for the court in part) (upholding an injunction prohibiting "the statements which have been found in this and prior proceedings to be false and libelous"); *McCarthy*, 810 F.3d at 462 ("Most courts would agree with Judge Wellford that defamatory statements can be enjoined . . . provided that the injunction is no 'broader than necessary to provide relief to plaintiff while minimizing the restriction of expression.'"); *Madsen v. Women's Health Ctr., Inc.* 512 U.S. 753, 763 n.2 (1994) (concluding that an injunction prohibiting anti-abortion protestors from demonstrating within a 36-foot buffer zone is not a prior restraint and clarifying that "[n]ot all injunctions that may incidentally affect expression [] are 'prior restraints'"); *Pittsburgh Press Co.*, 413 U.S. at 389-90 (holding that an injunction barring the placement of want ads for nonexempt employment in sex-segregated columns is not a prior restraint); *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441-45 (1957) (holding that a content-based injunction prohibiting the distribution of existing (but not future) obscene booklets was not a prior restraint); Tensmeyer, *supra* note 34, at 60 ("In one sense, it is clear that any injunction will forbid future speech. After all, an injunction cannot order someone not to have said something yesterday. But the modern view is simply that once a court has evaluated certain speech, it can enjoin repetitions of that speech." (footnote omitted)).

[77] This would be considered a Type II injunction under Professor Ardia's framework. Ardia, *supra* note 4, at 53.

it imposed a censorship regime on films prior to their initial exhibition.[78]  The Court therefore reached the correct result in *William Goldman Theatres,* even though it relied on an overly broad conception of prior restraints.[79]

## IV. Application of Strict Scrutiny

Having concluded that the injunction here is not a prior restraint and does not violate the no-injunction rule—which, in any event, has never been the law in Pennsylvania before today—the question becomes whether the injunction violates Article I, Section 7 of the Pennsylvania Constitution.  This analysis proceeds, as it does in other cases involving restrictions on speech, by considering the "fit" between the injunction's legitimate objectives and the restraints it imposes on speech.  We apply either strict or intermediate scrutiny, depending upon whether the restriction is content-based or content-neutral.[80]  The Galapos argue for application of strict scrutiny, whereas the

---

[78]    William Goldman Theatres, 173 A.2d at 64.

[79]    In this regard, I believe that our case law epitomizes the longstanding criticism that the phrase "prior restraint" sometimes serves as little more than a category label some courts attach to speech restrictions that they have concluded are impermissible for other reasons.  *See* LAURENCE H. TRIBE, AMERICAN CONSTITUTIONAL LAW §§ 12-34, at 1040 (2d ed. 1988) (stating that the Supreme Court "has often used the cry of 'prior restraint' not as an independent analytical framework but rather to signal conclusions that it has reached on other grounds"); *cf.* Michael I. Meyerson, *Rewriting Near v. Minnesota: Creating A Complete Definition of Prior Restraint*, 52 MERCER L. REV. 1087, 1089-90 (2001) ("It can become almost a game for attorneys defending speakers to affix the label of prior restraint on whatever law is being challenged."); *id.* at 1090 n.12 ("First Amendment expert Floyd Abrams once told a symposium that 'he was very tempted as an advocate, to characterize anything having the vaguest semblance to a prior restraint as a prior restraint, since prior restraints are somewhat of a taboo.'" (quoting Donald Gilmore, *Prologue (for "Near v. Minnesota 50th Anniversary Symposium")*, 66 MINN. L. REV. 1, 8 (1981))).

[80]    *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994) ("Our precedents . . . apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content," but only "an intermediate level of scrutiny" when "regulations are unrelated to the content of speech."); *S.B.*, 243 A.3d at 120 (Wecht, J., dissenting) (explaining that an injunction is content-neutral if it does "not (continued…)

Oberholzers maintain that the injunction is a content-neutral time, place, and manner restriction to which intermediate scrutiny applies. While Justice Brobson's dissent makes a convincing case for applying intermediate scrutiny, I ultimately conclude that the trial court's injunction would survive application of either test.

Under the strict scrutiny test, a content-based restriction on speech can be justified only if it is narrowly tailored to serve a compelling state interest.[81] There is clearly a compelling state interest in this case. The United States Supreme Court has stated repeatedly that "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society."[82] Surely, then, the state must have an exceedingly compelling interest in remedying tortious speech or expressive conduct that intrudes upon the tranquility or privacy of the home.[83] That interest is even higher when the legal remedies available to the tort victim are inadequate. In other words, the equity court in this case had a compelling interest in remedying a nuisance that intruded upon the tranquility of the Oberholzers' home—a nuisance for which the court concluded the Oberholzers had no other adequate remedy at law.

---

seek to ban any subject matter from being protested" but instead seeks to restrict "the excessive tactics used by the protesters, not to stifle the message itself").

[81] Nat'l Inst. of Fam. & Life Advocs. v. Becerra, 585 U.S. 755, 766 (2018).

[82] *Madsen*, 512 U.S. at 775 (quoting *Frisby v. Schultz*, 487 U.S. 474, 484 (1988)); *id.* (referring to the home as "the last citadel of the tired, the weary, and the sick" (quoting *Frisby*, 487 U.S. at 484)).

[83] It should be obvious that this case involves not merely the Galapos' expressive rights but also the Oberholzers' domestic rights. Most challenging cases arise when important rights come into direct conflict with one another. As Justice Holmes is said to have remarked, "My right to swing my fist ends where your nose begins." *See Your Liberty To Swing Your Fist Ends Just Where My Nose Begins*, QUOTE INVESTIGATOR https://quoteinvestigator.com/2011/10/15/liberty-fist-nose (discussing the origin of this expression).

As Justice Brobson explains today, and as Judge Stabile explained in the Superior Court, the injunction here also is extremely narrowly tailored to remedy the nuisance without burdening any more of the Galapos' speech than is absolutely necessary.[84] The injunction does not prevent the Galapos from expressing—to the Oberholzers or to anyone else—any of the messages that appear on any of the twenty-three signs. The injunction merely prohibits the Galapos from expressing those views in the exact manner that they had been employing—*i.e.*, the tortious manner, which consisted of a years-long performance involving a rotating assortment of nearly two dozen signs placed along the property line so that they would be visible from inside the Oberholzers' home. Even with the injunction in place, the Galapos remain free to communicate the messages featured on their signs to the Oberholzers in any other way that they please. They can move the signs to their front yard. They can hang fliers on telephone poles in the neighborhood. They can place bumper stickers on their cars. They can post the messages on a social media application for neighbors. They could even stand on the sidewalk in front of the Oberholzers' home holding the signs. I could go on. The critical point here is that the present injunction is laser-targeted to remedy the nuisance while preserving the Galapos' right to express their thoughts and ideas in a non-tortious manner. Strict scrutiny's narrow tailoring requirement therefore is satisfied in this case.

Indeed, the injunction here is so narrow that one wonders whether it was even effective. Because the equity court had to avoid creating a prior restraint on the Galapos' speech, the court's injunction did not go beyond the twenty-three signs enumerated in the settlement agreement, *i.e.*, the pre-existing signs that the Galapos did not dispute were tortious. Such orders can pose obvious enforcement problems, and equity courts

---

[84] *See* Justice Brobson's Dissenting Opinion at 19-21; *Oberholzer v. Galapo*, 274 A.3d 738, 770 (Pa. Super. 2022) (Stabile, J., concurring) ("I cannot fathom a more narrowly tailored remedy.").

considering whether to issue permanent injunctions must consider the practical realities of enforcing such an order.[85] But to the extent that Professor Chemerinsky is correct that any "effective injunction will be overbroad, and any limited injunction will be ineffective," it is important to emphasize that the present injunction is of the narrow, arguably ineffective type, not the broad, unconstitutional type.[86]

Furthermore, even assuming that the Majority is correct that the Galapos' aim here was at least partially to educate the "local community" on "the consequences of hatred and racism," it is important to underscore that nothing in the injunction actually prevents the Galapos from doing so.[87] The Galapos can convey their views about anti-Jewish hatred[88] or any other matters of public concern in any manner other than the one that the

---

[85] *See* Chemerinsky, *supra* note 4, at 171 (arguing that "[a]n injunction that is limited to preventing repetition of the specific statements already found to be defamatory is useless because a defendant can avoid its restrictions by making the same point using different words without violating the court's order"); *New York Times Co.*, 403 U.S. at 744 (Marshall, J., concurring) ("It is a traditional axiom of equity that a court of equity will not do a useless thing[.]").

[86] Chemerinsky, *supra* note 4, at 171.

[87] *See* Majority Opinion at 52. *But see* Justice Brobson's Dissenting Opinion at 10 (emphasizing that the signs "were not directed toward the public" and that Dr. Galapo himself admitted that "it was irrelevant whether anyone other than the Oberholzers saw the signs" (emphasis omitted)).

[88] Oddly, although Dr. Galapo was spurred to erect his signs by anti-Jewish slurs uttered by the Oberholzers (*see* Majority Opinion at 2 n.1), almost all of the Galapos' twenty-three signs complained of "racism", and none of them explicitly referred to Jews, Judaism, antisemitism, or anti-Jewish hatred. One sign did read "✡ Never Again". *Id.* at 2-3 n.2. I do not know whether the Galapos chose "racism" as a euphemism for anti-Jewish hatred and, if so, why they chose to obscure the nature of the particular bigotry at hand. Alternatively, the Galapos may consider hostility against Jews as partaking of a racial animus, as it has for Nazis and some other Jew-haters over time. Regardless, while most of the Galapos' signs spoke broadly in terms of "racism," it is important to point out that the signs were erected specifically in response to anti-Jewish hatred, not some generic or generalized "racism". *See* Simeon Chavel, *Jews, Semites, and Antisemitism*, University of Chicago (Nov. 3, 2023), https://divinity.uchicago.edu/sightings/articles/jews-semites-and-antisemitism ("Jewish (continued…)

equity court concluded (and the Galapos did not dispute) was tortious. The injunction has no impact at all on the Galapos' freedom to speak to the community about anti-Jewish hatred in any of the usual ways that many of us do.[89]

identity cannot be reduced to either the biologizing 'race/ethnicity' or the spiritualizing 'religion,' but the categories themselves of race and religion are each inflected by the other. Instead of conceptualizing groupings or identities as reducible to single and fixed characteristics, we need an approach that recognizes the multifaceted nature of identity and the fluid, circumstantial dynamics of groups. We would also do well to refer to hatred of Jews and things Jewish in those very terms and to cease using the esoteric, coded, misleading, and deeply troubled terms of 'semitic' identity and 'antisemitic' sentiment and behavior altogether."); Yair Rosenberg, *Are Jews a Race?*, THE ATLANTIC (Feb. 1, 2022), https://www.theatlantic.com/newsletters/archive/2022/02/are-jews-a-race-whoopi-goldberg-holocaust/676814 ("[P]eople have trouble fitting Jews into their usual boxes. They don't know how to define Jews, and so they resort to their own frames of reference, like 'race' or 'religion,' and project them onto the Jewish experience. But Jewish identity doesn't conform to Western categories, despite centuries of attempts by society to shoehorn it in. This makes sense, because Judaism predates Western categories.").

[89] *See, e.g.*, Pete DeLuca, *Dozens rally against antisemitic messaging in Squirrel Hill*, WPXI (Aug. 2, 2024), https://www.wpxi.com/news/local/dozens-rally-against-antisemitic-messaging-squirrel-hill/WBDWSHSY7ZEM3O6JXUYGXGSXHA; Adam Babetski, *Pittsburgh Jewish community condemns antisemitism, vandalism at 'Fight with Light' rally*, PITTSBURGH POST-GAZETTE (Aug. 2, 2024), https://www.post-gazette.com/local/city/2024/08/02/chabad-vandalism-graffiti-pittsburgh-jewish-community-antisemitism/stories/202408020109; David Rullo, *Justice David Wecht urges activism in the face of antisemitism*, JEWISH CHRONICLE (Apr. 19, 2024), https://jewishchronicle.timesofisrael.com/justice-david-wecht-urges-activism-in-the-face-of-antisemitism; Joel Cohen, *Justice Wecht Breaks Judicial Silence on Anti-Semitism*, TABLET (Apr. 2, 2019), https://www.tabletmag.com/sections/arts-letters/articles/justice-david-wecht-antisemitism; David Wecht, *The fight against Jew-hatred is everyone's fight*, PITTSBURGH POST-GAZETTE (Nov. 2, 2023), https://www.post-gazette.com/opinion/guest-columns/2023/11/02/wecht-hamas-terrorism-antisemitism-gaza/stories/202311010019; David Wecht, *Young Jews, stand up for your people!*, JEWISH NEWS SYNDICATE (Apr. 27, 2022), https://www.jns.org/young-jews-stand-up-for-your-people; David Wecht, *We all must fight hatred in our daily lives*, PITTSBURGH POST-GAZETTE (Oct. 30, 2018), https://www.post-gazette.com/opinion/Op-Ed/2018/10/30/We-all-must-fight-hatred-in-our-daily-lives/stories/201810300025; David Wecht, *Jews and justice: some contemporary thoughts*, JEWISH CHRONICLE (May 4, 2018), https://jewishchronicle.timesofisrael.com/jews-and-justice-some-contemporary-thoughts; David Wecht, *Heed Brandeis' call to be better Jews*, JEWISH CHRONICLE (Jun. 2, 2016), https://jewishchronicle.timesofisrael.com/heed-brandeis-call-to-be-better-jews.

Put simply, because the present injunction survives even strict scrutiny, I see no need to resolve whether the injunction is content-based or content-neutral. Either way, the injunction does not violate Article I, Section 7 of the Pennsylvania Constitution.

## V. Conclusion

This case concerns the question of whether equity courts have the power to enjoin tortious speech when the plaintiff otherwise lacks an adequate remedy at law. The Galapos argue that the present injunction violates the no-injunction rule, that it is an unconstitutional prior restraint on speech, and that it fails strict scrutiny. These arguments are unpersuasive. The no-injunction rule does not exist in Pennsylvania. Moreover, even if it did exist, it would not apply here because the equity court did not purport to enjoin defamatory speech. Furthermore, most states that have embraced the no-injunction rule have limited it to the preliminary injunction context. The argument that the injunction constitutes a prior restraint is also mistaken because the injunction does not restrict speech in advance of its publication. Finally, the injunction withstands application of strict scrutiny because it is narrowly tailored to serve a compelling state interest.

I respectfully dissent.